JoNes, Chief Judge,
delivered the opinion of the court:
Each of the plaintiffs owns an undivided fractional interest in a tract of unimproved land containing 55.84 acres in San Luis Obispo County, California. From July 1943 until the latter part of 1946, the defendant used this tract, which is located on the seacoast, as an artillery range and bombing area in connection with amphibious training operations. This suit arises out of an alleged breach by che defendant of a contract to restore the land to the condition it was in when the defendant first took possession. The outcome of this suit depends on a determination of the date when the plaintiffs’ claims accrued.
In August 1943, Alfred Goldbach, the record owner of a two-thirds interest in the tract, executed a written permit or lease giving the defendant the right to use the land for training purposes. This two-thirds interest was later conveyed to Eva Lesem on August 27, 1946, but the deed was not recorded until May 24,1956. Eva Lesem instituted this action on May 11,1956; she died on September 11, 1956. A motion for leave to substitute Janice N. Spitzel, executrix *401 of Miss Lesem’s estate, as plaintiff was allowed on July 9, 1958.[1]
In exchange for the permit to use the land, the Government promised to pay a rental of one dollar per year and to restore the land to the same condition it was in when the permit was executed. There is no evidence that the defendant succeeded in obtaining a lease or permit from the owners of the remaining undivided one-third interest in the tract.
From July 1943 until the latter part of 1946, the Department of the Army used this tract and several adjoining tracts of land to train troops. As a part of these Army field exercises, shells from artillery, mortars, and other weapons were fired over and upon the plaintiffs’ land. During the latter part of 1946 the Department of the Army made an inspection of the land, decided it was free of unexploded ammunition, and, as of December 31, 1946, terminated the lease or permit under which it had occupied the tract.[2]
However, in June 1950, the Corps of Engineers was advised that members of a party engaged in surveying the land used by the Army in amphibious training exercises had found some unexploded ammunition on the beach in the area of the land in suit. A civilian dedudding expert was dispatched to dispose of the ammunition by detonation. It was reported that this expert had found that an area of approximately 640 acres, including the plaintiffs’ tract, contained impact signs created by high explosives, and it was learned from local citizens that many explosions had taken place there during a small brush fire.
Subsequently, during the period from March 3 through March 8, 1951, a bomb and shell disposal team carried on dedudding operations in the area. When this latter operation was completed the Corps of Engineers recommended that the property be restricted to surface use only and that the owners be advised that it was dangerous to use the land *402 for other than surface use. Goldbach, who was still the record owner of a two-thirds interest in the tract, was so advised in June, and again in August, of 1951. The Corps of Engineers also informed Eva Lesem by letter in August 1951 that steps were being taken to flag the perimeter of the contaminated area, and that warning signs would be posted on the property when the extent of that area had been determined. She was asked to withhold any action until the survey had been completed. Diligent efforts were also made to contact the owners of the remaining one-third interest in the tract and to advise them of its condition. Prior to 1951 none of the plaintiffs were aware that the tract had been used as an artillery range and bombing area.
During October 1951, further dedudding operations were undertaken, after which the commanding officer of the bomb and shell disposal team executed a document certifying that the land had been carefully searched and that all explosive materials reasonably possible to detect had been removed. He recommended, however, that an area described in his certificate be restricted to surface use and stated that warning signs had been posted on the land. Accordingly, on October 31, 1951, the Los Angeles District Engineer of the Corps off Engineers executed an affidavit , which stated in substance that certain described property, including the land in suit, had been used by the Army as an artillery range arid bombing area until December 1946; that while an attempt had been made to decontaminate the area, there might be unexploded mines, bombs, and other missiles on the land which might constitute a hazard to life and property, and that the area was therefore considered dangerous for any purposes involving subsurface use. This affidavit was recorded on December 4,1951, in the land records of San Luis Obispo County.
On November 1, 1951, the District Engineer mailed Gold-bach a copy of this affidavit and advised him that it would be recorded “in the public records of San Luis Obispo County.” Goldbach also received a map on which was outlined in red an area described by the District Engineer as “the area finally determined to be dangerous to use except for surface purposes.” (Emphasis supplied.) On November 14, 1951, *403 representatives of the Corps of Engineers met in San Luis Obispo with a number of the owners of contaminated property, at which time the procedure for filing claims for damages was explained and claim forms were distributed. Gold-bach was notified of the meeting, but failed to attend.
The defendant takes the position that the plaintiffs’ claims accrued when the Army terminated its permit or lease on December 31,1946. It then contends that this action, which was not instituted until May 1956, cannot be maintained, since it fails to meet a requirement of 28 U.S.C. § 2501. The provision in § 2501 relied on by the defendant states that “Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed * * * within six years after such claim first accrues.” Except for the claim of plaintiff Spitzel, we agree that these claims may not be maintained. But we do not agree that the claims accrued in 1946.
The defendant’s obligation to these plaintiffs arose from its promise to restore the plaintiffs’ land.[3] It is not unreasonable to interpret this obligation as one which continued until the parties were aware, or should have been aware, that the land had not, in fact, been restored. And even after it became known that the land had not been restored, the defendant was entitled to a reasonable period of time within which to fulfill its obligation. Therefore, the plaintiffs’ claims did not accrue until the condition of the plaintiffs’ land became known, and the defendant thereafter either failed to restore the land within a reasonable period of time or expressed a relatively final judgment that the land could not be restored:
The evidence in this case shows that the dangerous condition of the plaintiffs’ land was hot fully brought to light until March 1951, after a bomb and shell disposal team had carried on dedudding operations in the area. It was shortly after this that the Corps of Engineers advised Goldbach and Lesem, and attempted to advise the remaining owners, that it was impossible to guarantee complete subsurface *404 neutralization of unexploded ammunition, and that it was therefore considered dangerous to use the land for other than surface use.
The Corps of Engineers did make another attempt to restore the land in October 1951. It can be said that this October 1951 dedudding operation was undertaken within a reasonable period of time after the condition of the land became known, and that the plaintiffs’ claim had not then accrued. However, shortly thereafter, the Corps of Engineers did make public a relatively final determination that the plaintiffs’ land could not be restored. In November 1951, it mailed Goldbach the “map on which is outlined in red the area finally determined to be dangerous to use except for surface purposes.” (Emphasis supplied.) Warning signs had already been posted on the contaminated land in October 1951. Goldbach and other effected property owners were then invited to a meeting at which the procedure for filing claims for damages was explained and claim forms were distributed by the Corps of Engineers. And in December 1951, the Corps of Engineers went so far as to record in the land records of San Luis Obispo County the affidavit which stated that the contaminated area was considered dangerous for any purpose involving subsurface use.[4] In the light of these circumstances, the court holds that the plaintiffs’ claims accrued in December 1951.
The claim of plaintiff Spitzel, executrix of Eva Lesem’s estate, was filed in May 1956, and therefore meets the requirement of 28 U.S.C. §2501. However, the owners of the remaining one-third interest in the tract did not become parties to this action until October 20, 1958;[5] therefore, in *405 view of tlie showing made here, they have failed to satisfy the requirement of 28 TJ.S.C. §2501 for maintaining an action in this court.
The fair market value of the tract in December 1951 was $70 per acre, or a total of $3,908.80. If the tract had been in the same condition it was in when the Army took possession in July 1943, the fair market value would have been $275 an acre, or a total of $15,356.00. Therefore, the diminution in the value of the tract of land in suit at the time plaintiffs’ claims accrued was $11,447.20.
The plaintiffs contend that the measure of damages should be the cost of restoring the land to the condition it was in when the defendant first took possession. But this court has held that where the cost of restoration exceeds the diminution in the fair market value, as in the case at bar, the measure of damages shall be the diminution in the fair market value.[6] The reason for this is obvious. To hold otherwise would put the plaintiff in a better position than he would have been had the defendant actually performed the contract. The plaintiffs do not deny the general validity of this rule, but contend that there are California civil and criminal statutes which require the plaintiffs to decontaminate the property. We are unable to read the statutes cited to us by plaintiffs as imposing any liability on these landowners for the condition created by the Government.
Plaintiff Spitzel is entitled to recover $7,631.47. This sum represents two-thirds of the diminution in value of the premises resulting from the defendant’s failure to restore the land to the condition it was in when the defendant first took possession. Since the remaining plaintiffs did not become *406 parties to this action within six years from the time their claims accrued, we must hold, on the evidence before us, that under the provision of 28 U.S.C. § 2501 their claims may not be maintained in this court. For this reason the petition as to Louise Tevis Sharon, Edith Newlands Johnston, Janet Newl'ands Johnston, Frederick von Bredow, Lord Thomas Fermor-Iíesketh, and Eobert A. Sharon, Hurford C. Sharon and Lillian Sharon as executors under the will of William Evan Sharon, deceased, is dismissed. Judgment will be entered accordingly.
It is so ordered.
DaNaher, Circuit Judge, sitting by designation; Lara-more, Judge; MaddeN, Judge, and Whitaker, Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. On July 1, 1943, Alfred B. Goldbach was the record owner of a two-thirds interest in a tract of land containing 55.84 acres in San Luis Obispo County, California, described as follows: Lots 3 and 4 of Section 23, Township 30 South, Eange 10 East, MDB&M. The tract has a frontage of 2,100 feet along the Pacific Coast; its southern boundary is about 1,350 feet long; the east side is approximately 2,600 feet long, and the north side approximately 450 feet long. In 1943 most of the land consisted and at the present time consists of stabilized sand dunes that are rough and rolling in topography, but there is a small area of active sand dunes. Depending upon the tide, the land has a sandy ocean beach varying between 100 feet and 300 feet in width. The beach runs up to a rise or a cliff which varies from 10 feet to 20 feet high on the north side of the property and gradually rises to a height of more than 35 feet on the south end of the property. Back of the rise the land is somewhat more level. There have never been any improvements on the land. It is covered with a sparse growth of vegetation which is typical of the area. The nearest road to the land is the Pecho Eoad, a county road which was paved sometime after 1946 and is *407 600 feet from the east line of the tract. The only access to the property by land is by a circuitous trail from the Pecho Eoad over the lands of adjoining owners.
2. At the request of the defendant, acting through the Department of the Army, Goldbach executed a written permit on or about August 3,1943, by which the defendant acquired the right to use his interest in the land for training purposes in connection with the operation of the Bay wood Park Training Area, Camp San Luis Obispo, California. The defendant also acquired from the respective owners the right to use several adjoining tracts of land for the same purpose, entered into possession of an area of about 640 acres and used it to train troops in amphibious landings on the beach. The land was defended by heavy artillery, mortars, and small arms fired from the hills overlooking the beach.
3. The record shows that at or about the same time Gold-bach signed the permit, the defendant attempted to get in touch with the owners of the remaining one-third interest in the tract of 55.84 acres but was advised by a San Francisco bank that the ownership of the one-third interest was divided among several persons, most of whom resided in England, and that it would be impossible for the defendant to get in touch with any of them, except two owners of an undivided %6 interest. The evidence does not establish whether the defendant thereafter succeeded in obtaining a lease or permit from the owners of the undivided one-third interest in the tract in suit.
4. Neither party has been able to locate a copy of the permit or lease signed by Goldbach, but the evidence otherwise establishes that he signed a written agreement permitting the Government to use the premises in consideration of a rental payment of one dollar per year and an agreement to restore the property in the same general condition as it was in when the permit was executed. In August 1943, Goldbach was informed that the land was to be used for training troops who would be engaged in field exercises on seacoast property. It was not until 1951 that he learned that shells from artillery, mortars, and other weapons had been fired over and upon the land.
*408 5. As of July 1, 1943, Alfred Goldbach held the record title to two-thirds interest in the tract as agent and trustee for Eva Lesem, a single woman, who acquired such two-thirds interest in the land in the 1930’s with the intention of later establishing thereon a home for a theosophy group of which she was the leader. Since Miss Lesem had little money and Goldbach was the most affluent member of the group, she transferred title to him without monetary consideration but with the understanding that he would hold the title, pay the taxes, and reconvey it to her when it would be needed by the theosophy group.
On August 9, 1943, Goldbach informed the defendant by telegram that he had signed the permit without obtaining permission of the person who actually owned the property. A short time thereafter, he requested the defendant to send him a copy of the permit so that he could transmit it to the real owner, stating that she wished to remain unknown. A copy of the permit was mailed to him on August 23, 1943, and he thereafter sent it to Miss Lesem, who ratified his execution of the permit in favor of the Government. Gold-bach disclaims any interest in the property in suit. By deed dated August 27, 1946, he conveyed his interest in the land to Eva Lesem, but the deed was not recorded in the Land Records of San Luis Obispo County until May 24,1956.
6. During the latter part of 1946, the Department of the Army made an inspection of the land, decided it was free of unexploded ammunition, and as of December 31,1946, terminated the lease or permit under which it had occupied the premises.
7. On February 4, 1947, Goldbach executed a written release by the terms of which he released the defendant from all claims arising out of the permit and the occupation of the land by the Army. The release read in part:
The permitter hereby agrees to waive any Notice of Cancellation and restoration as required by said permit, and that this instrument shall constitute when accepted by the Contracting Officer, United States of America, a valid cancellation of said permit by the mutual consent of the parties hereto.
*409 As stated above, Goldbach had conveyed his interest in the land to Eva Lesem before the release was executed. At the time the release was mailed to him for signature, he consulted Miss Lesem and she authorized him to sign it.
8. On June 8,1950, the Division Engineer of the Corps of Engineers was advised that a member of a party engaged in surveying the land used by the Army in amphibious training exercises had found some unexploded ammunition on the beach and that a civilian dedudding expert had been dispatched to dispose of the ammunition by detonation. It was also reported that the expert had found that an area of approximately 640 acres contained impact signs created by high explosives and had learned from local citizens that many explosions had taken place there during a small brush fire. Thereafter, during the period from March 3 through March 8,1951, a bomb and shell disposal team carried on de-dudding operations in the area. When the work was completed, the Corps of Engineers recommended that the property be restricted to surface use only and that the owners be advised that is was considered dangerous to use the land for other than surface use.
By letter of June 14, 1951, Goldbach was advised that because of the nature of the use made by the Government, the utilization of the land was restricted to surface use only. On August 3,1951, the Corps of Engineers again wrote Gold-bach in part as follows:
_ As a result of additional information we have obtained since our letter to you of 14 June 1951, we regret we find it necessary to confirm what has previously been stated. The land described herein, and as shown on the inclosed map in color was used by military forces as a training area for amphibious landings on the beach, defended by heavy artillery from the hills overlooking the beach. Prior to termination of all leases on this range a thorough inspection was made, from which it was considered that the land was free and clear of all unexploded ammunition.
Later, some metal fragments and duds were discovered and were reported to the Army, as a result of which a second inspection was made by an Army Bomb and Shell Disposal Team made up of personnel highly qualified in demolition work. All unexploded ammu *410 nition and harmful material found by the second inspection were removed and destroyed. Even though this work has been carefully done a second time, the fact that the land in question was utilized as an impact area makes it impossible to guarantee complete sub-surface neutralization of unexploded ammunition. It is therefore considered dangerous to use the described land for other than surface use. It is sincerely regretted that this condition exists on your land.
9. By letter of August 24, 1951, the Corps of Engineers informed Eva Lesem that steps were being taken to flag the perimeter of the contaminated area and that when the extent of that area had been determined, warning signs would be posted on the property. In the letter she was asked to withhold any action until the survey had' been completed.
10. On October 9, 1951, Goldbach wrote the Corps of Engineers in Los Angeles, stating that he had known nothing of the dangerous condition of the land until he had been so advised by the Corps of Engineers more than four years after the date he executed the release. His letter also stated that the permit had been given to the defendant with the understanding that the land would be restored to its original condition and requested the Government to restore the property without delay. By reply of October 26, 1951, the the Corps of Engineers advised Goldbach that every effort was being made to remedy the situation and requested that he withhold any. action pending the completion of a survey.
11. During October 1951, further dedudding operations were carried on on the land and the commanding officer of the bomb and shell disposal team executed a document dated October 16, 1951, certifying that the land had been carefully searched and that all explosive materials that it was reasonably possible to detect had been removed. He recommended, however, that an area described in his certificate be restricted to surface use and stated that warning signs had been posted on the land.
On October 31, 1951, the District Engineer of the Los Angeles Corps of Engineers executed an affidavit which was recorded on December 4, 1951, in the Land Records of San Luis Obispo County, and stated in substance that certain de *411 scribed property, including the land in suit, had been used by the Army as an artillery range and bombing area until December 1946; that while an attempt had been made to decontaminate the area, there might be unexploded mines, bombs, and other missiles on the land which might constitute a hazard to life and property, and that the area was therefore considered dangerous for any purpose involving subsurface use.
12. On November 1,1951, Goldbach was mailed a copy of a map outlining the contaminated area. Shortly thereafter, he was invited to attend a meeting of property owners to be held on the premises of one of the owners in San Luis Obispo on November 14, 1951, so that a plan might be evolved to solve the problem of contamination.
Representatives of the Corps of Engineers met with a number of the property owners on November 14, 1951, at which time the procedure for filing claims for damages was explained and claim forms were distributed. Neither Goldbach nor Eva Lesem attended the meeting.
13. In response to a letter which Goldbach had written to the President on January 17, 1952, the Corps of Engineers wrote him on February 8, 1952, that since he had signed a release which relieved the Government of any liability for its use of the land, the Corps of Engineers had no authority to compensate him for damage and that any compensation made could only be paid on the basis of a claim. The letter stated that his claim should be filed with the District Engineer in Los Angeles, who would forward it to the Comptroller General.
Goldbach asserted no written claim, but on September 5, 1952, the District Engineer received Eva Lesem’s written claim for damage to her two-thirds interest in the land. The claim was in the amount of $25,000 and stated that she did not know the extent of damage, except that the affidavit of the District Engineer, which had been recorded in the Land Records, stated that a dangerous condition existed and that signs to that effect had been posted on the land. Her claim further stated that she had purchased property originally for $5,333, had subsequently deeded it to Alfred Goldbach in trust, and that on July 1, 1947, Goldbach had conveyed *412 it to her “for services of spiritual, educational and financial nature, extending from 1916 (continued to 1952), and for my share of profits of sale of real estate selected by me, also for counsel relative to business and financial transactions.”
14. On October 3, 1953, and again on May 30, 1954, Miss Lesem wrote the Corps of Engineers, requesting payment of the claim she had filed on September 5, 1952.
The processing of the claims of Miss Lesem and other property owners was suspended until it was decided by the defendant that the District Engineer should negotiate with the owners with a view to settling the claims by acquiring their interest in the lands through the medium of leases in which the Government as lessee would have an option to purchase the property during the term of the lease. On October 18,1954, Miss Lesem’s attorney received written notice that negotiations with the owners would begin when title reports and appraisal data were received by the District Engineer. On May 20, 1955, the District Engineer wrote Miss Lesem that his office had been instructed to negotiate with the owners to execute leases to the Government for a term of five years from December 31,1946, the date the permits were terminated by defendant. The letter further stated that a lump-sum rental would be paid to each lessor for the period from Jan'u-ary 1,1947 to December 31,1954, that an annual rental would be paid thereafter at the end of each fiscal year, that the lease would grant the Government an option to purchase the property at any time during the five-year term, and that if the option was exercised by the Government, all rental paid or due by it would be applied toward the purchase price. Since the District Engineer had encountered difficulty in locating the owners of the undivided one-third interest in the 55.84 acres, he also requested her to furnish the addresses of such owners.
15. On September 27,1955, the Corps of Engineers wrote Miss Lesem’s attorney that, in accordance with the proposed lease-purchase plan, the rental valuation of the land owned by Miss Lesem and others had been set at the lump sum of $3,910 for the period from January 1, 1947 to December 31, 1954; that an annual rental of $780 had been determined for the period beginning January 1,1955, and that the mar *413 ket value of the property had been established at $19,550. The market value so stated represented the Corps of Engineers’ appraisal of the value of the tract in an uncontaminated condition in 1955.
The letter also pointed out that the title to that portion of the tract not vested in Miss Lesem was so involved among several estates in the process of settlement that there was little likelihood that the Government could enter into lease-purchase agreements with the owners of the one-third interest until such estates were settled.
By letter of October 24, 1955, to Miss Lesem’s attorney, the Corps of Engineers requested that the deed by which Goldbach reconveyed the land to Miss Lesem be submitted for examination, along with advice as to how future rents under the lease-purchase agreement were to be paid, and stated that when this information was received, a lease-purchase agreement would be forwarded to the attorney for execution by Miss Lesem.
Although the letters are not in evidence, the record shows that the Corps of Engineers mailed a proposed lease-purchase agreement to Miss Lesem’s attorney and wrote him regarding the matter on January 26 and again on March 30, 1956. He replied by letter of May 11, 1956, stating that the terms of the lease were not satisfactory to his client and that he had filed suit in this court.
16. On May 11, 1956, this suit was filed by Eva Lesem for herself as owner of an undivided two-thirds interest in the land and in behalf of the owners of the remaining one-third interest, which owners were alleged to be unknown to Miss Lesem. At the time Miss Lesem filed this petition the owners of the remaining one-third interest had not authorized a suit to be filed in their behalf.
On September 11, 1956, Eva Lesem died testate. A motion for leave to substitute Janice N. Spitzel, executrix of her estate, as plaintiff, was filed on June 27,1958, and allowed on July 9,1958.
17. On October 20,1958, a motion was filed herein for leave to amend the caption of this suit by adding as parties plaintiff the following persons, whose ownership in the land in suit was alleged to be as shown below:
*414 Louise Tevis Sharon, an undivided % interest.
Edith Newlands Johnston, an undivided %6 interest.
Janet Newlands Johnston, an undivided %6 interest.
Frederick von Bredow, an undivided y36 interest.
Lord Thomas Fermor-Hesketh, an undivided y2i interest.
Kobert A. Sharon, Hurford C. Sharon and Lillian Sharon as executors under the will of William Evan Sharon, deceased, an undivided y2á interest.
The motion was allowed on November 5,1958.
18. On June 26, 1957, the Security Title Insurance Company of San Luis Obispo, California, issued a preliminary title report showing that as of that date Eva Lesem held the record title to an undivided two-thirds interest in the land in suit and that the title to the remaining undivided one-third interest was vested in the persons named in the preceding finding and in the proportions stated therein.
19. The only evidence relating to the cost of restoring the land to the condition existing in 1943 is the testimony of a witness for plaintiff who walked over the land on June 29, 1957, and thereafter made an estimate that it would cost $39,216 to remove all of the metallic material from the tract. He estimated the cost of the labor and material required for locating the metallic material by the use of mine detectors, staking and flagging each location indicated by the detectors, hand-digging the material, de-fusing and detonating any unexploded ammunition, loading the metallic material and hauling it away in dump trucks, plus insurance, taxes, contingencies, overhead and profit. His estimate includes the following:

*415 The evidence establishes that the land was dedudded on two occasions by the Army and that in one of such operations Army bomb and disposal squads waited over the land shoulder to shoulder with mine detectors and marked or flagged the location of all metallic objects indicated by the detectors. All metal found was removed at a later date. The principal items of cost in the above estimate consist of the cost of the labor of digging, loading, and hauling away the metallic material, plus workmen’s compensation insurance and equipment rental related to such labor costs.
20. During the entire period pertinent to this action, the land involved here had little or no agricultural value. It is too rough and rolling and the soil is not sufficiently fertile to produce crops. As grazing land, it would not support more than two animal units, and the cost of fencing the land would exceed the revenue that could be derived from using it as grazing land.
21. Since 1946 the highest and best use for the land in suit has been and is for subdivision into lots fronting on the ocean or having views of the ocean.
In December 1951, when the actual condition of the land was known and when the District Engineer recorded an affidavit describing the condition thereof, the fair market value of the tract was $70 per acre or a total of $3,908.80. If it had then been in the same condition as it was in July 1943, the fair market value of the property would have been $275 an acre or a total of $15,356.00.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff Janice N. Spitzel, executrix of the estate of Eva Lesem, is entitled to recover, and it is therefore adjudged and ordered that she recover of and from the United States seven thousand six hundred thirty-one dollars and forty-seven cents ($7,631.47).
The court further concludes as a matter of law that plaintiffs Louise Tevis Sharon, Edith Newlands Johnston, Janet Newlands Johnston, Frederick von Bredow, Lord Thomas Fermor-Hesketh and Robert A. Sharon, Hurford C. Sharon *416 and Lillian Sharon as executors under the will of William Evan Sharon, deceased, are not entitled to recover and the petition as to them will be dismissed.

 Eva Lesem originally acquired this two-thirds interest in the tract in 1927. Subsequently, sometime in the 1930’s, title was conveyed to Goldbach as trustee and agent for Miss Lesem. Goldbach reconveyed the interest to Miss Lesem on August 27, 1946, prior to the Army’s termination of its permit to use the land. This latter deed was not recorded until May 24, 1956.

 On February 4, 1947, Goldbach, acting as agent for Miss Lesem, signed a release which stated, in part, that “The permitter hereby agrees to waive any Notice of Cancellation and restoration as required by said permit * * In deference to the unusual circumstances of this ease, the defendant concedes that this release should be treated as ineffective.

 We assume that the defendant’s obligation to restore the land existed in favor of all the plaintiffs, although the evidence reveals that the only express contract was made with Goldbach, record owner of only a two-thirds interest.

 The evidence indicates quite strongly that Goldbach and Lesem interpreted these actions by the Corps of Engineers, which culminated in the recording of the affidavit, as a final determination that the land could not be restored. On January 17, 1952, Goldbach wrote to the President requesting compensation for the damage to the land. In response to this letter, the Corps of Engnieers informed Goldbach that compensation could be made only on the basis of a claim filed with the District Engineer, who would forward it to the Comptroller General. Goldbach asserted no written claim, but on September 5, 1952, the District Engineer received Eva Lesem’s written claim for damages to her two-thirds interest in the land. On October 3, 1953, and again on May 30, 1954, Miss Lesem wrote the Corps of Engineers requesting payment of the claim she had filed on September 5, 1952.

 This suit was instituted on May 11, 1956, by Eva Lesem “for herself as owner of an undivided % interest and in behalf of the owners of the remaining undivided % interest in a parcel of land * * These owners of the re *405 maining undivided one-third interest had not authorized a suit in their behalf, and were, in fact, unknown to Miss Lesem at the time the petition was filed. They did not become parties to this action until October 20, 1958, pursuant to a motion entitled “Motion for Leave to Amend Caption, to Add Parties Plaintiff and for Extension of Time to Pile Plaintiffs Finds [sic] of Fact and Conclusions of Law.” It goes without saying that each of these plaintiffs has a separate and distinct interest in the land in suit. The mere fact that each has an undivided interest in a single tract of land affords no basis in law for permitting one of the owners to bring this type of an action in behalf of the remaining owners.

 Baddy v. United States, 134 C. Cls. 338, 342.
The facts in the instant case present an eentirely different question in respect of value to the issues presented in the case of Georgia Kaolin Company v. United States, 145 C. Cls. 39. The two cases are readily distinguishable.