Laramore, Judge,
delivered the opinion of the court:
Through this congressional reference (S.R. 331, 86th Congress, 2d session) ,[1] the United States Senate has asked us to pass on plaintiffs’ legal and equitable entitlement to *205 recover damages against the United States for an alleged diminution in value of 3,059 acres of land in Tennessee which were under lease to the United States during the Second World War, as part of the Spencer Artillery Eange. Plaintiffs’ claims are based on an alleged breach of a provision of the lease agreement which required defendant to restore the leased property to the condition it was in when defendant first took possession. Plaintiffs attribute the alleged diminution in value of their lands to the presence of unexploded shells and bombs which were left on the lands by defendant at the expiration of the leases. There is no dispute that of the original 26,000 acres which comprised the Spencer Artillery Eange, 3,059 acres were ultimately restricted in 1956 to surface use by certification of the Corps of Engineers after a series of unsuccessful attempts by defendant to clear this area of unexploded shells. That this constitutes a breach of the lease agreement is not seriously contested by defendant. However, defendant challenges plaintiffs’ legal and equitable entitlement to recover on three grounds: (1) our 6-year statute of limitations, 28 U.S.C. §2501 bars any recovery, (2) all of plaintiff Macy Land Corporation’s claim, and part of plaintiff Eocky Eiver Company’s claim, is null and void under the Assignment of Claims Act, 31 U.S.C. § 203, (3) both plaintiff Eocky Eiver and plaintiff Macy Land Corporation’s predecessors in title signed valid releases which discharged defendant from any further liability in connection with the leased property.

Statute of Limitations

Defendant contends that plaintiffs’ claims are barred by our 6-year statute of limitations since plaintiffs’ causes of action first accrued in 1946 when the leases were terminated. The record discloses that the final certificate of clearance was sent plaintiffs on November 29, 1956, by the Corps of Engineers. Contained therein was the following statement:
This Certificate of Clearance supersedes all previous Certificates.
Thus it was not until November of 1956 that a final determination was made as to the extent to which the land could *206 not be restored by defendant. Under our decision in Spitzel v. United States, 146 Ct. Cl. 399, 403 (1959) it is at this point that plaintiffs’ causes of action accrued. The petition in the case at bar was filed on August 22, 1960 and, therefore, meets the 6-year requirement of 28 U.S.C. § 2501.

Assignment of Claims Act

Plaintiff Rocky River Company is the owner of 2,516 acres of land within the areas presently restricted to surface use. Of these 2,516 acres, 425 acres were acquired in fee by the company from the government’s former lessors in 1952 and 1953, some six or seven years after the leases were terminated. The defendant contends' that any claim that Rocky River may have with respect to the 425 acres of land which it acquired from the government’s former lessors is null and void under the Assignment of Claims Act, 31 U.S.C. § 203 (1958 Ed.). The same contention is made as to plaintiff Macy Land Corporation, since the corporation did not in fact lease any lands to the United States. The record discloses that the corporation purchased 4,213.11 acres of land from Valentine E. Macy, Jr., whose predecessors in title had leased the land to the United States as part of the artillery range, and on November 19,1952, the corporation purchased 933.31 acres of land from other former lessors of the government. Of these 5,146.42 acres of land, 512 acres are located within the restricted areas. The record discloses that the leases with the former owners ran in favor of the owners, their heirs, “successors and assigns.” The claims here asserted arise out of the express provision of restoration contained in the leases. The cause of action in the case at bar did not accrue until after the property in question was acquired by the assignees. In other words, it was not until after a series-of unsuccessful attempts by the government to restore-the entire property to its prior condition in 1956 that a breach of the restoration provision occurred. It has been held that the provisions of the anti-assignment statute apply only to claims existing at the time of the transfer. Milliken *207 v. Barrow, 65 Fed 888 (C.C. La. 1895), affirmed 74 Fed. 612; (5th Cir. 1896), cert. denied 167 U.S. 746 (1897). Consequently, plaintiffs are not barred by the anti-assignment statute from prosecuting their claims herein. See also, United States v. Jordan, 186 F. 2d 803, 808 (6th Cir. 1951),. affirmed by an equally divided court, 342 U.S. 911 (1952).

Release amd Discharge

The record discloses that plaintiff Rocky River Corporation through its president, on November 29, 1946, executed and delivered to the United States a formal release of its claim which discharged the United States from all actions,, liability and claims which it ever had, then had, or ever would have, arising out of the lease and occupation by the United States of the leased property. Plaintiff Macy Land Corporation’s predecessors in title likewise either signed formal releases or compromised their claims. Defendant contends that these executed releases and compromises discharged the United States from all claims in law and equity arising out of the contract to which the release or compromise relates. Hellander v. United States, 147 Ct. Cl. 550 (1959). Our commissioner has found that none of the releases-contemplated disposition .of the matter of damages, which might be due to unexploded shells remaining on any-of the tracts of land comprising the Spencer Artillery-Range. Defendant has not challenged this finding and we accept it. However, we do not think that this finding of fact can vary the legal effect of the releases. We do not think that the facts in this case come within those special and limited situations in which a claim at law may be prosecuted despite the execution of a general release. E.g., Nippon Hodo Company, Ltd. v. United States, 142 Ct. Cl. 1 (1958) (mutual mistake of fact) ; Winn-Senter Construction Co. v. United States, 110 Ct. Cl. 34 (1948) (fraud or-duress).
We consider the present situation as a unilateral mistake of fact which cannot serve as a basis for reformations *208 of the general releases, but which is relevant to the question of plaintiffs’ equitable entitlement within the meaning of our congressional reference jurisdiction. Since plaintiff Rocky River and plaintiff Macy Land Corporation’s predecessors in title at the time they executed these general releases were not aware that their property could not be restored to its prior condition, we think that the conscience and honor of the sovereign dictates that plaintiffs be recompensed for the diminution in value of their lands as a result of defendant’s breach of the restoration provision of the leases. This is especially true here where everybody thought that the entire artillery range could be successfully decontaminated. Georgia Kaolin Co. v. United States, 145 Ct. Cl. 39 (1959). This important fact distinguishes our Hellander decision, supra, where we held that a general release executed at the time when the parties were fully aware of the claim for which they subsequently seek damages discharges the United States from both legal and equitable liability. Consequently, we hold that plaintiffs have an equitable claim against the United States as that term is used in the statutory enactment which confers jurisdiction upon this court in congressional reference cases. 28 U.S.C. § 2509 (1958 Ed.).

Valuation

The plaintiffs claim that the restricted property contains valuable coal deposits and that the presence of unexploded bombs and shells prevent them from conducting coal mining operations on the property. The record discloses that 318 acres of the 3,059 acres within the restricted areas contain an estimated 800,000 tons of coal. There is no evidence that there was any appreciable amount of coal in the remaining 2,741 acres. The commissioner has found that the highest and best use of the 2,741 acres was for agricultural purposes. He has determined that on the basis of comparable sales of agricultural lands in the general area that the market value of the 2,741 acres was $15 per acre. Plaintiff has excepted to this finding. We have examined the *209 record and have determined that the commissioner’s finding is supported by the evidence. The commissioner has found that the market value in 1956 of the 318 acres of proven coal lands contained within the restricted areas was $62 per acre or a total of $19,716, if such lands had not been contaminated by unexploded shells. Plaintiffs have also challenged this finding.
It appears that the commissioner has at least considered the figures of defendant’s expert witness, Spalding, who in accordance with his appraisal report testified with respect to the value of the 318 acres containing 800,000 tons of coal, that the value of the coal bearing lands was $19,706.[2] This expert used the “capitalization method” in determining the value of the 800,000 tons of coal found in the 318 proven acres. This expert has used $0.10 per ton as a royalty from a lessee to the lessor for production in his computations. However, the commissioner has found that the usual royalty paid by the lessee-miner to the lessor-owner has been $0.25 per ton. We think this latter figure is supported by the evidence. Using the same capitalization method as used by defendant’s witness Spalding, which in our view provides a reasonable basis for valuation of lands such as these here involved, we have determined that the value in 1956 for the 318 acres of proven coal lands was $50,673.60. To this we add $41,115 determined to be the value of the other 2,741 acres, and subtract $3,059 determined to be the nominal value of the 3,059 acres in their present state. This gives us a total of $88,729.60, or approximately $29 an acre which we believe plaintiffs are equitably due. Therefore, pursuant to the request contained in S.R. 331, supra, we recommend that Congress pay this amount to plaintiffs.
This opinion and the findings of fact, together with the court’s conclusion thereon, will be certified to Congress pursuant to S.R. 331.
*210 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
X. Plaintiff Rocky River Company, Inc., is and was at all times hereinafter mentioned a Tennessee corporation, owning lands in Van Burén, Sequatchie, and Warren Counties, Tennessee.
Plaintiff Macy Land Corporation is and ever since the fall of 1950 has been a Tennessee corporation, owning lands in Warren and Sequatchie Counties, Tennessee.
2. Plaintiffs are the claimants named in Senate Resolution 331, 86th Congress, 2d Session (passed by the Senate on June 23, I960) which provides as follows:
Resolved, That the bill (S. 3307) entitled “A bill for the relief of Rocky River Company and Macy Land Corporation”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimants.
S. 3307 proposes legislation as follows:
A BILL
For the .relief of Rocky River Company and Macy Land Corporation.
Be it enacted by the Senate cmd House of Representatives of the United States of America in Congress assembled., That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Rocky River Company and Macy Land Corporation, the sum of $181,082.- *211 21, in full settlement of all tlieir claims against the United States for compensation for damages for coal and other mineral rights and properties not considered and compensated for in a previous settlement sustained by them with respect to certain lands owned by them and located in Van Burén County and Sequatchie County, Tennessee, such lands having been leased by the United States for use as an artillery range during the period from 1940 to 1946 and left uncleared of unexploded shells: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. . Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
¡3. On December 21, 1940, Rocky Kiver Company leased to the United States a tract of land (then estimated to be 25,000 acres) in Van Burén, Sequatchie, and Warren Counties, Tennessee, for 25 cents per acre per annum, the land to be used by. the United States Army as an artillery range. The original term of the lease was from January 1, 1941, to June 30j 1941, with the right of annual renewal on the part of the Government to June 30,1966. By supplemental agreement between the parties, dated May 11,1942, the leased tract as a result of a survey was agreed to contain 19,752.51 acres. This lease was renewed from year to year and the lands used by the United States Army as the major part of the Spencer Artillery Range until August 13, 1946, when this lease was duly terminated.
4. On. December 21, 1940, the defendant entered into 11 other leases with various other owners of other lands in the same area, covering about 6,295 acres of land. These leases were also renewed from year to year and the lands used by the United States Army as part of the Spencer Artillery Range until about August 13, 1946, by which date these leases were also duly terminated.
5. The Spencer Artillery Range covered about 26,000 acres of land. The pertinent lease numbers, the names of the *212 lessors, and the number of acres included in the above-described leases are as follows:

6. Plaintiff Macy Land Corporation did not own or lease to the United States any of the lands comprising the Spencer Artillery Range.
On November 14, 1950, the Macy Land Corporation acquired title to the 4,213.11 acres of land which had been leased to the defendant by James C. Colgate and Valentine E. Macy, Jr., under lease No. W-54-QM-1972, and used by defendant as part of the Spencer Artillery Range until termination of the lease in 1946. The deed of conveyance of title to Macy Land Corporation was executed by Valentine E. Macy, Jr. Prior to the execution of such deed, Mr. James C. Colgate had died, and the record in this case is silent as to how or when Mr. Macy acquired the title of Mr. Colgate. The Macy Land Corporation is and was completely owned and controlled by Mr. Macy and his family.
On November 19, 1952, the Macy Land Corporation acquired title to the 933.31 acres of land which had been leased to the defendant by Solon L. Robinson, et al., under lease No. W-54-QM-1981 and used by defendant as part of the Spencer Artillery Range until termination of the lease in 1946.
*213 7. Paragraph 8 of Lease No. W-54 — QM-1941 between plaintiff Eocky Eiver Company and the defendant contained a restoration clause in pertinent part as follows:
* * * tbe Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted: Provided, however, that if the Lessor requires such restoration, the Lessor shall give written notice thereof to the Government ninety days before the termination of the lease.
By letter dated August 30,1944, Eocky Eiver Company gave due notice to the defendant that restoration of the leased premises would be required.
Each of the other 11 leases covering the lands in the Spencer Artillery Eange contained a restoration clause like that quoted above.
8. At and ever since the time the various tracts comprising the Spencer Artillery Eange were leased to the defendant in December 1940, the Eocky Eiver Company was the owner of the minerals and mineral rights in the lands covered by the above-described leases numbered W-5NQM-1978, 1984, 1986, 1987, 1988, and 1990, even though Eocky Eiver Company did not acquire fee title to such tracts until 1952 or 1953, as hereinafter stated in this finding.
After the leases were terminated in 1946, the Eocky Eiver Company acquired fee title to various tracts of land which had been leased to defendant by their former owners. These acquisitions by the Eocky Eiver Company are summarized as follows:

*214 9. Under date of August 14, 1946, Rocky River Company submitted to the U.S. Corps of Engineers a lengthy and detailed claim for damages to its property covered by Lease No. W-54-QM-1941.
The summary of such claim is set forth therein, as follows:
The following is a summary of the losses and damages done to the leased property, during the life of said lease heretofore referred to, which losses and damages are the result of said lease, for all of which the Said Rocky River Company, Inc. files its claim against the Lessee in said Lease, covering the various, following items, which are total losses as herein set out, to wit:
Possession lots, Houses, Barns and Other Improvements_$2, 743. 00
Bobinson Springs Coal Mines (Surface Improvements)_ 2, 525. 00
Bobinson Springs Coal Mines (Under ground losses)- 2,662.00
Bobinson Springs Coal Mines (Under ground losses at Mine No. 2)_ 250. 00
Timber Cut and Destroyed by Lessee- 44,488.38
Timber destroyed by fire during tbe life of tbe lease_ 3, 600. 00
Tbe Destruction of young growing timber_ 14,650.00
Total losses for wbieb claim is filed_70, 918. 38
This claim did not purport to include any damages on account of the presence of unexploded shells on the premises, but such claim stated with respect to such shells as' follows:
UNEXPLORED SHELLS
Prior to the termination of said lease, the lessee attempted to clear the leased territory of unexploded shells and bombs, evidently realizing that unexploded shells and bombs on the property would destroy its value, as its use and occupation would be hazardous.
It now appears that said attempts failed and that unexploded shells and bombs were left promiscuously over said leased property and are still to be found scattered here and there over said property, some.of which are partly or entirely buried in the ground, some covered by grass and some boldly exposed to view.
These unexploded shells and bombs create a serious menace to the use and occupation of said premises and incite a fear that destroys the market value of said property.
*215 It will be stated in this connection that the attention of said Lessee has been called to these unexploded shells and bombs and an effort is now being made to clear said premises of same.
In view of the present efforts of the Government to clear the premises of said unexploded shells and bombs, said Rocky River Company, Inc. does not, at this time, file any specific claim for damages on this account, trusting said area will be cleared of same. However, it reserves the right to file such claim, provided the premises are not cleared of such shells and bombs within a reasonable time, which claim would be the market value of the property.
,10. A further reference to unexploded shells was made in an affidavit of E. C. Brock, President of Rocky River Company, subscribed to on September 21, 1946, and attached to the above-mentioned claim:
* * * that he and said W. R. Clendenon, preparatory to taking said leased property back when the lease was terminated, inspected said premises and found unexploded shells or bombs within the area of said lease and reports from many citizens of that vicinity indicate other such shells or bombs: that the promiscuous finding of such duds or unexploded shells and bombs over this area would have the effect of practically destroying the value of the property in such affected area: * * *
11. On November 29, 1946, Rocky River Company, by its President, E. C. Brock, executed and delivered to the United States a formal release of its claims under Lease No. W-54QM-1941, which release provided in pertinent part as follows:
Now, Therefore, Know All Men By These Presents, that we, rocky river compaky, INCORPORATED for and in consideration of the sum of One Dollar and other valuable considerations, the receipt of which are hereby acknowledged, have remised, released, and forever discharged, and by these presents do for ourselves, our successors, and assigns, remise, release, and forever discharge the United States of America, its officers, agents, and employees of and from all manner of actions, liability, and claims (except any unpaid rent for the period ending 13 August, 1946) against the United States of America, its officers, agents, and employees which we or they ever had, now have, or ever will have upon, or by reason of any matter, cause, or thing whatsoever, *216 particularly arising out of said lease and the occupation by the United States of America of the aforementioned property, with the exceptions of the items of damages set out on the back of this sheet, amounting to $70,918.38.
The exceptions to the release, mentioned in the above-quoted language, were set forth on the second page of the release, as follows:
EXCEPTION S
I hereby reserve the right to claim damage and to file a proper claim therefor with the proper department of the Government for the following items of damage to the property described on the front page of this sheet.

Amount of Item damage claimed

Loss of possession, lots, houses, bams and other improvements _$2,743. 00
Loss of surface improvements at Robinson Springs Coal Mines_ 2, 525. 00
Loss of underground improvements at said mines_ 2, 662. 00
Loss of underground improvements at said mines (Mine No. 2)_ 280.00
Timber cut and destroyed by Lessee_ 44,488.38
Timber destroyed by fire during life of the lease_ 3, 600. 00
The destruction of young growing timber_ 14, 650. 00
Total_70, 918.38
12. The above-described claim of the Rocky River Company for damages of $70,918.38 to the lands covered by Lease No. W-54-QM-1941 was processed through administrative channels to the General Accounting Office which on October 28,1947, issued its certificate of settlement, allowing the sum of $32,960 to Rocky River on its claim.
13. The Rocky River Company accepted under protest the amount allowed by the General Accounting Office on the above-described claim, reserving the right to bring and prosecute an action to recover the full amount of the claim. On May 8, 1948, Rocky River filed a petition in this court to recover the disallowed balance of such claim, the prayer of such petition being for judgment in the sum of $70,918.38, less a credit of $32,960 for the payment made by the General Accounting Office.
*217 This petition, filed in an action entitled Rocky River Company v. United States of America, Ct. Cl. No. 48651, itemized as claimed damages the seven items set forth in the administrative claim, as described in finding No. 9 above, and contained no statement concerning unexploded shells remaining on the leased lands.
14. During the pendency of the case described in the foregoing finding, the parties held settlement conferences which resulted in Rocky River’s submitting to defendant its written offer to settle the case for $18,000.
On July 13, 1949, the parties filed in such prior case their formal stipulation by which they agreed that judgment be entered in favor of plaintiff and against the defendant in the sum of $13,000. This stipulation described in general terms the Rocky River lease (W-54-QM-1941), recited the filing of the above-described administrative claim, set forth the seven items of damage of such claim, noted the allowance by the General Accounting Office of $32,960 of the $70,918.38 claim, and provided further as follows:
5. On February 3,1949, the plaintiff offered to accept the sum of $13,000 in full and complete settlement of the balance of its claim, amounting to $37,958.38, and on June 6,1949, the Attorney General of the United States accepted the plaintiff’s offer in compromise.
6. It is stipulated and agreed that the sum of $13,000 is intended to and does cover all damages and claims of every kind and character which the plaintiff may have sustained or to which it may be entitled as a result of any and all things mentioned and set out in the petition, or as a result of the operation by the United States of the artillery range on the plaintiff’s land, or in any wise accruing by reason of any alleged waste by the United States of the timber, improvements, buildings, mining equipment and the land of the plaintiff.
During the settlement negotiations, no mention was ever made of unexploded shells remaining on the leased lands, nor was any such statement contained in plaintiff’s offer in compromise or in the stipulation of the parties.
15. Pursuant to the stipulation, this court on October 3, 1949, entered an order which quoted inter alia paragraph 6 of the stipulation and entered judgment in 'such prior case for plaintiff in the sum of $13,000.
*218 16. With respect to the 11 other leases (see findings 4 and 5) covering lands included in the Spencer Artillery Range, each lessor (or set of lessors where there were more than one on a particular lease) either (A) executed at the time of termination of the lease a general release in the language form set forth in finding 11, with the release stating exceptions as to claimed damages to timber and/or improvements; or (B) at the time of the termination of the lease, entered into a supplemental agreement with the defendant, by which the defendant agreed to pay a certain specified sum of money to the lessor for “waste” committed by defendant on the leased lands.
Of these 11 sets of lessors, the following 4 executed the general release form, filed administrative claims as to the excepted items, and subsequently received the following amounts pursuant to settlement certificates of the General Accounting Office:

The other 1 of the 11 sets of lessors entered into supplemental agreements with defendant at the time of the termination of their leases, which agreements settled the amounts of money to be paid by defendant for waste committed on the lands, summarized as follows:
W-M-QM-1972 W-54-QM-1981 W-54-QM-1983 W-5-LQM-1984 W-54-QM-19S7 w-54r-QM-1988 W-54-QM-1990 James C. Colgate and Valentine E. Maoy, Jr_. Solon h. Robinson, et al... Jess Mofíit, et al... Rom Dodson.-. — .— A. F. Curtis and Della Curtis. W. M. Curtis and Versa J. Curtis. Cora Poole. $7,056.75 210.00 1,730.00 162.00 675.00 350.00 775.00
*219 Each of these 7 supplemental agreements contained the following provision:
2. That the Lessor hereby remises, releases and forever discharges the Government, its officers, agents, and employees, of and from any and all manner of actions, liability, and claims (except any unpaid rent for the period ending midnight July 25,1946) against the Government, its officers and agents, which the Lessor now has or ever will have, or by reason of any other matter, cause or thing whatsoever particularly arising out of said lease and the occupation by the Government of the aforesaid premises.
All of the foregoing releases, supplemental agreements or certificates of settlement were executed or issued at various times between July 1946 and January 1948.
From all of the evidence in this case, it is found that none of the foregoing releases, settlements, or awards contemplated disposition of the matter of damages which might be due to unexploded shells remaining on any of the tracts of land comprising the Spencer Artillery Eange.
17. Dedudding Operations. At various intervals between the summer of 1945 and the summer of 1956, the Corps of Engineers' attempted to clear the lands comprising the Spencer Artillery Eange of unexploded bombs and shells known as “duds” which were found primarily in the impact areas of the artillery range. In 1945, civilian personnel of the Corps of Engineers, together with German prisoners of war, went over the range with mine detectors for the purpose of locating, removing, destroying or rendering harmless unexploded bombs and shells of various types. These initial efforts on the part of the Department of the Army to clear the impact areas of duds, which were completed in November 1945, proved to be unsuccessful. Thereafter, beginning in 1950, bomb and shell disposal squads were assigned to clear or decontaminate the impact areas of live or unexploded bombs and shells. These activities continued until March 1952, as the result of which the Corps of Engineers issued an original certificate of clearance and map indicating the areas restricted to surface use. The original certificate of clearance was dated March 11,1952, and approved the following year on May 12, 1953. This certificate was recorded in *220 the Office of the Register of Van. Burén County, Tennessee, on June 24,1953, and a copy of the certificate, together with the map attached thereto which showed the area restricted to surface use, was mailed to the Rocky River Company soon thereafter. The map attached to this first certificate of clearance showed that an area of 1,900 acres of land was restricted to surface use.
13. A subsequent examination of the impact areas of the former artillery range by representatives of the Corps of Engineers resulted in a revised certificate of clearance dated March 22, 1955, and approved April 26, 1955. This certificate recommended the removal of restrictions on 565 acres of the 1,900 acres of land which were restricted to surface use in the original certificate of clearance which had been recorded on June 24, 1953, as stated in the previous finding. The revised certificate of clearance dated March 22, 1955, and the map attached to the certificate apparently were never recorded.
19. A short time after the revised certificate of clearance was issued, the Corps of Engineers wrote the Rocky River Company and the Macy Land Corporation on May 25, 1955, referring to the previous certificates of clearance and advising the two companies that it was considered to be in the best interests of the Government, the companies, and especially the general public that an inspection be made of the remainder of the former artillery range for the purpose of determining the necessity of conducting further detailed search for “contaminated and dangerous material.” The letter requested the companies to grant the defendant a right of entry for the purpose of “inspecting, searching and performing demolition and disposal activities as may be determined appropriate — .” This request was immediately granted by the plaintiffs. In fact, the record shows that the plaintiffs cooperated with the Corps of Engineers to the fullest extent in granting permission for entry on their lands to bomb and shell disposal squads who were assigned to clear the impact areas of all unexploded bombs and shells.
In August 1955, the Corps of Engineers conducted an extensive ground inspection of the former artillery range which was supplemented by a low altitude aerial survey *221 from a helicopter. Many more unexploded projectiles were discovered in the impact areas, some of which were so deep in the ground that it was impracticable to reach them. Further searches of the impact areas were made between August 1955 and July 1956. As a result of these extensive operations, including aerial reconnaissance, the Corps of Engineers issued a final certificate of clearance on August 15, 1956, which was approved October 3, 1956, and forwarded to the plaintiffs with an explanatory letter dated November 29, 1956.
The final certificate of clearance is as follows:
CERTIFICATE OF CLEARANCE
All lands shown outlined in blue on the attached Eange Map, Plan No. 6965-704, dated 12 April 1944, Camp Forrest, Tennessee, Spencer Artillery Eange, consisting of approximately 23,981 acres, have been given a careful visual search or inspection and have been cleared of all dangerous and/or explosive materials reasonably possible to detect.
It is recommended that the areas shown in red and in yellow on the above referenced range map may be restricted to surface use only.
It is recommended that the restriction to surface use previously attached to lands shown in orange be lifted.
It is recommended that the lands shown in green and all lands other than those shown in red and yellow be used for any purpose for which the land may be suited.
This Certificate of Clearance supersedes all previous Certificates.
Note: For the convenience of the land.owner, the areas recommended for surface use restriction have been separated into two categories, as follows:
(a) The areas shown in red (Class A) are those which searching procedure clearly indicated received high explosive rounds 240,155,105, 76 and 75 millimeter projectiles, all of which are of such size and class as to require special armament for equipment and personnel if the land owner determines it necessary to pursue subsurface operations.
(b) The areas shown in yellow (Class B) are those which received smaller rounds than the above, as 37 and 20 millimeter projectiles, and no surface evidence exists at present of any contamination by heavier rounds. If the land owner determines it necessary to conduct sub *222 surface operations in these areas, personnel will require protection but it is believed no special armored equipment will be needed by reason of the existence of such rounds.
In either case, if sub-surface operations are undertaken by the land owner, it must be at his sole risk.
The lands restricted to surface use by the final certificate of clearance, as shown on the map attached to the certificate, contained 3,059 acres, about one-half of which were designated “Class A” and the other half “Class B.”
20. On June 20, 1957, the plaintiffs wrote the Corps of Engineers requesting a definition of the terms “surface use” and “subsurface use” as used in the final certificate of clearance.
By letter dated July 9,1957, the Corps of Engineers advised the plaintiffs in part as follows:
The terminology “surface use” as used in the clearance certificate provides for the use of the exterior surface of the land as it exists without disturbing the soil. Such restriction denotes that the land is decontaminated to an extent that cultivation is not practical. Therefore, while a light cultivation would be less hazardous, it is not practical to try and restrict the use on the basis of the degree or type of cultivation. In this connection, although it is recognized that the potential hazard from planting seedlings or scratching the surface sufficiently to cover grass seed in most cases is very slight and might be accomplished successfully on the basis of a calculated risk, the Government will not be responsible or accept any liability from such action.
In view of the foregoing, any use of the land that would disturb the soil of the exterior surface would be classified as “subsurface use.”
This explanatory letter makes it clear that the restricted areas whether designated “Class A” or “Class B” are useless for all practical purposes.
21. Throughout the period of the dedudding operations, from 1945 through the summer of 1956, the lessors of the various tracts comprising the Spencer Artillery Range were assured by responsible officials of the Corps of Engineers (both orally and in writing) that the leased lands would be *223 eventually cleared of unexploded shells, and plaintiff Kooky River Company and the other lessors in good faith relied upon such representations and refrained from filing any claims for damages to such lands on that account, not knowing until November 29,1956, that there would be any permanent restrictions to the use of some areas of such lands, or the extent of such permanently restricted areas, or the degree of any such permanent restrictions.
22. Plaintiffs Rocky River Company and Macy Land Corporation are owned and controlled by substantially the same stockholders. Commencing in 1950, the officers of these companies attempted to interest large coal mining companies in leasing substantial areas of their lands for the strip mining of coal. Mr. Valentine E. Macy, Jr., organized the Macy Land Corporation and conveyed to it his tract of the pertinent lands (as described in finding 6) because one coalmining company indicated it would prefer to deal with a corporation rather than an individual.
To carry out their purposes of endeavoring to have developed a large coalfield which would include some of their lands and parts of adjoining tracts, and in reliance upon the representations of defendant’s agents that all of the Spencer Artillery Range lands would be eventually cleared of unexploded shells, Macy Land Corporation purchased the Solon L. Robinson tract (as related in finding 6) and Rocky River Company purchased other smaller tracts comprising the Spencer Artillery Range, as related in finding 8. By the end of 1953, the plaintiffs thus owned fee title to all of the Spencer Artillery Range tracts (as listed in finding 5) except the tract which was the subject matter of lease No. W-54-QM-19Y1.
23. Plaintiff Rocky River Company is the owner of 2,516 acres of land within the areas (3,059 acres) restricted to surface use by the final certificate of clearance. Of these 2,516 acres, 425 acres were acquired in fee by Rocky River in 1952 and 1953 from the defendant’s former lessors in the transactions described in finding 8.
*224 The acreage owned by Eocky Eiver Company in the restricted areas, including lands acquired in fee after the termination of the leases, is as follows:

24.Plaintiff Macy Land Corporation is the owner of 512 acres within the areas (3,059 acres) restricted to surface use by the final certificate of clearance. All of these 512 acres were acquired from defendant’s former lessors after termination of the leases as follows:

25. Within the 3,059 acres comprising the restricted areas, there are 31 acres which were part of the tract of land leased to defendant by W. A. Curtis and Martha Curtis under Lease No. W-54-QM-1971. There is no evidence that either plaintiff ever acquired any title to these 31 acres.
26. Between April 25, 1960, and May 2, 1960, the Corps of Engineers, with the consent and approval of the plaintiffs, placed metal warning signs about 1,000 feet apart around the perimeter or boundary of the 3,059 acres of land included within the contaminated areas, which indicated the possibility of danger from the presence of unexploded bombs and shells within the posted area.
*225 27. The plaintiffs’ lands which comprised the former Spencer Artillery Range are located for the most part in Van Bnren Comity, Tennessee, with small portions extending beyond the county line into Warren and Sequatchie Counties. These lands are part of the Cumberland Plateau which is about 50 miles wide and extends a distance of approximately 250 miles across the State of Tennessee in a generally northeast-southwest direction.
The Spencer Artillery Range, including the areas restricted to surface use, was located on the southern part of the Cumberland Plateau, several miles south of Spencer (the county seat of .Van Burén County) and about 40 miles northwest of Chattanooga. The 26,000 acres of land which were included within the artillery range are in the main gently rolling, with some gorges in the northern part cut by the Rocky River and its tributaries, but such gorges are substantially removed from the general vicinity of the restricted areas. The elevation of the plateau surface of the former artillery range varies from 1,820 to 2,040 feet above mean sea level.
28. A mineral formation known as the Sewanee coal seam imderlies the former artillery range and the lands in its immediate vicinity, and the Sewanee coal seam recurs throughout the Cumberland Plateau.
Sewanee coal is generally found in horizontal seams and is unusual and quite different from other coal formations in that its thickness and depth underground cannot be predicted with any degree of certainty at any given spot. Where present, the seams of Sewanee coal frequently vary from 0 to 80 inches in thickness and can Only be assumed to project a few feet, since even where the seams are thick they usually thin out rapidly and vanish within 100 feet, and without exploration (drilling) there is no way to ascertain where another seam will begin (except where there are outcroppings) or how thick or deep beneath the surface it will be.
29. In the southern part of the Cumberland Plateau where the plaintiffs’ property is located and throughout an extensive area to the north the Sewanee coal is usually recovered by strip mining. The method used to obtain the coal consists in removing or stripping the overburden above the *226 coal by means of heavy draglines, bulldozers and mechanical shovels. The overburden is removed in large strips of 80 feet or more until the coal is reached, and this in turn is removed by draglines and power shovels. After the coal has been removed by this process, another strip adjacent to the pit is then strip mined in a similar manner and the overburden is thrown into the pit from which the coal had been removed. Strip mining renders the land useless for any other purpose. For many years, the usual royalty paid by the lessee-miner to the lessor-owner has been 25 cents per ton for coal removed from the land stripped.
The evidence established that between August 16,1961, and April 1, 1962, an area of approximately 18 acres located between 3,000-3,500 feet from the restricted lands was strip mined at depths of up to 45 feet with moderate success from the standpoint of the mining company. Rocky River Company, as lessor of these 18 acres, received $14,000 in royalties on the coal mined and sold.
30. Between 1950 and 1952 (pursuant to options to lease) the Sinclair Coal Company (now merged with Peabody Coal Company) and the Pittsburgh and Midway Coal Company drilled approximately 3,000 test holes to determine the extent of coal deposits on 25 selected and separated tracts of plaintiffs’ lands located within and without the area which had comprised the Spencer ArtiEery Range. The total cost of these exploratory operations was about $250,000. The drilling was done on 330-foot centers in areas where outcroppings of coal had first been found and mapped.
In aE of the 25 tracts explored by test driEing, there were 2,098 acres containing coal in place in the amount of 5,499,823 tons. Of the 2,098 acres, 748.13 acres containing 2,211,935 tons of coal were in 10 tracts, and parts of two other tracts, all located outside the former artillery range. Thus, there were 1,349.87 acres containing 3,287,888 tons of coal within the former artillery range.
31. Six of the tracts driEed by the coal companies were located in what are now the contaminated or restricted areas comprising 3,059 acres of land. In these six tracts there were and are 318 acres containing about 800,000 tons of coal. The coal seam in these tracts averages about 25 inches in thickness, *227 although varying widely from one drill hole to another. There is no evidence that there is any appreciable amount of coal in the remaining 2,741 'acres of the restricted areas.
The depth of the coal seam in these 318 acres varies from outcroppings at the surface to 65 feet under the surface. Tested on the generally accepted rule in the area that for economically successful coal stripping there should be at least 1 inch of coal for each 15 inches of overburden removed, and based upon consideration of the expert testimony in this case, it is found that the 800,000 tons of coal in the 318 acres would have been economically recoverable except for the restrictions on the use of such lands on account of the presence of unexploded shells.
32. Based upon a consideration of all of the testimony and evidence with respect to the valuation of coal-bearing lands, it is found that in 1956 the market value of the 318 acres of proven coal lands contained within the restricted areas was $50,673.60, if such lands had not been contaminated by unexploded shells.
33. The highest and best use of the other 2,741 acres of land in the restricted areas was for agricultural purposes. On the basis of comparable sales of agricultural lands in the general area, it is found that in 1956 the market value of such lands was $15 per acre, or $41,115, if such lands had not been contaminated by unexploded shells.
34. The evidence in this case is insufficient to permit a breakdown as to the distribution of the 318 acres of coal lands either (a) as to the present ownership of each plaintiff, or (b) as between the various tracts leased to the defendant, as described in finding 5.
On the basis of the foregoing valuation of the 318 acres of coal lands and the valuation of the 2,741 acres of agricultural lands, it is found that the average value per acre in 1956 of the 3,059 acres of restricted lands would have been approximately $29 per acre, if such lands had not been contaminated with unexploded shells.
The 1956 market value of the lands within the restricted areas, in the condition of contamination because of the presence of unexploded shells, was the nominal amount of $1 per acre for each of the 3,059 acres, or a total of $3,059.
*228 The evidence in this case is not sufficient to establish that there were incidental or severance damages resulting to other lands of the plaintiffs by the contamination of the 3,059 acres.

 Since this case was referred, the pleadings filed, and the trial held prior to the Supreme Court’s decision in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we deem it proper to file this report without reference to the opinions in that case.

 Our commissioner’s valuation figure is within $10 of the value set by the witness Spalding.