## SUMNER *v.* WALKER.

### (*District Court, S. D. New York.* March 4, 1887.)

1. **CARRIERS—OF GOODS—CONNECTING LINES—NEGLIGENCE.**

    Connecting carriers are not liable to the owner of goods for the negligence of each other, except upon some contract or understanding making them so.

2. **SAME—THROUGH BILLS OF LADING—TRANSHIPMENT—PRIOR DAMAGES— OFFSET.**

    A through bill of lading, providing for a transhipment to another vessel at an intermediate port, and for payment of the whole freight at the port of discharge, does not import the joint liability of each, or that the latter carrier is the agent of the former, but independent rights of the latter ship, and does not impose upon the latter vessel any liability for damages occasioned by prior negligence. She is therefore entitled to collect her just freight upon delivery of the goods, without offset or deduction for prior damages without her fault.

*Owen & Gray,* for libelant.
*Putney & Bishop,* for defendants.

BROWN, J. The libel in this case was filed to recover the sum of $576.86, the balance of freight due the ship Reporter upon the delivery of 1,129 packages of tea brought from Hong Kong, China, and delivered to the defendants in February, 1886. The answer denies that the goods were delivered by the ship to the defendants, and alleges that the delivery was made by the ship to Russell & Co., and that Russell & Co. delivered the teas to the defendants, and that on the voyage the cases were so damaged by the carrier's negligence that the cases required cooperage to the amount of some $500, which they claim to offset, if liable at all. The tea was shipped at Amoy, China, by Brown & Co., on board the steamer Esmeralda, and a bill of lading therefor, dated September 25, 1885, was given, signed by the "Agents of Russell & Co., Charterers of the Reporter," which recited the shipment of the tea by "Brown & Co. in good order, on board the Esmeralda, bound for Hong Kong, * * * for transhipment to American ship Reporter for New York, and to be delivered, in like good order and condition at New York, to the order of Messrs.

Brown Brothers & Co., or assigns; freight payable in New York at the rate of 25 shillings sterling per ton in approved sixty days' sight bills on London, or in gold coin, at the captain's option." It was conceded at the trial that the teas were sold to the defendants to arrive, and that the above bill of lading was duly indorsed and delivered to them by Brown Bros. & Co.

Russell & Co. were engaged in the business of carriers and forwarders from Amoy, and at the time of the above shipment had obtained a charter of affreightment of the libelant's ship Reporter for a voyage from Hong Kong to New York, for the round sum of $10,000 in gold, "in full for the whole capacity of the vessel." The charter provided that bills of lading "should be signed by the captain at any rate of freight without prejudice to the charter-party, and that the captain should have an absolute lien on the cargo for freight." On arrival of the Esmerelda at Hong Kong, the tea was transhipped to the Reporter, and bills of lading therefor signed by the master of the Reporter on October 2, 1885; reciting that the goods were shipped in good order by Russell & Co. on board the Reporter, bound for New York, and to be delivered there "to Russell & Co., as agents; freight payable in New York at the rate of 25 shillings sterling per ton; not accountable for leakage or breakage."

On arrival of the Reporter in New York in February, 1886, the custom-house broker of the defendants, to whom the original bills of lading had been given, for the purpose of entering the goods in the custom-house, finding that entry could not be made without the bills of lading of the Reporter, surrendered the Esmeralda's bills of lading to the libelants' agents here, and received instead thereof bills of lading signed by the master of the Reporter. Upon the latter bills of lading the goods were entered at the custom-house by the defendants, and delivery of the tea was made directly from the Reporter to the defendants at the wharf, whence they were carried to the warehouse designated by them.

The evidence shows that, though no tea was lost, the cases were considerably broken, and required cooperage as stated in the answer. There is no evidence to show any negligence on the part of the Reporter. The master states that he observed the condition of the cases when they were received on board of the Reporter at Hong Kong, and that they were in the same condition when delivered here as when they were received there, and that no damage arose on the Reporter. The stowage on the Reporter was good, and there was no evidence of any derangement of the cargo, or of any rough usage. Upon the question of fact, it must be assumed that the breakage arose prior to the receipt of the goods at Hong Kong, for which the Reporter, and the libelants, as her owners, are in no way responsible.

The question for determination is whether, under the above circumstances, the Reporter is entitled to collect the whole freight stipulated, or whether her demand for the agreed freight is subject to any offset on account of negligent handling prior to her receipt of the goods.

1. The respondents are liable personally to pay whatever freight the Reporter was authorized to collect, and for which she might have main-

tained her lien upon the goods. The terms of the Esmeralda's bill of lading, although somewhat different from the usual form in omitting the words "*he or they to pay* freight," by their context import the same meaning and obligation, and imposed upon the consignees, upon their acceptance of the goods, the duty of paying the freight. It was so held in *Weguelin* v. *Cellier,* L. R. 6 H. L. 286, 288, 295, upon the terms of a bill of lading precisely similar. The cases of *Elwell* v. *Skiddy,* 77 N. Y. 282, and *Dart* v. *Ensign,* 47 N. Y. 622, turned upon the fact that the consignee was but the agent of the shipper. The context in the bill of lading also shows that, of necessity, this freight was to be paid to the Reporter, since her captain was to have an option to receive the freight either in gold coin, or a 60-days sight bill on London.

2. It is well settled in this country that each carrier on a through bill of lading, or on connecting lines, is liable only for the negligence that arises on his own line, unless some different understanding be shown, or circumstances upon which such an understanding should be inferred. *Railroad Co.* v. *Pratt,* 22 Wall. 123, 95 U. S. 43; *Harding* v. *International Nav. Co.,* 12 Fed. Rep. 168. The fact that a through rate is stipulated for is not sufficient to prove such an understanding. *Stewart* v. *Terre Haute, etc.,* 3 Fed. Rep. 768, 1 McCrary, 312. There is no evidence of any such understanding between Russell & Co. and the master of the Reporter as should make the latter liable for the faults of the former; nor, as respects the carriage of the goods from Hong Kong to New York, was there any relation of principal and agent between them, although Russell & Co., by their original bill of lading may have made themselves answerable for the whole distance. See *The Bernina,* 12 Prob. Div. 36. The master of the Reporter acted by an independent contract with Russell & Co. He had chartered the whole capacity of his vessel to Russell & Co. for a lump sum, stipulating that for his security for the payment of that sum he should have a lien upon the cargo for his freight. This is the usual form of a charter of affreightment. Under this arrangement, which the shippers at Amoy, by acceptance of the bill of lading, assented to and authorized, Russell & Co. were alone liable for negligence before transhipment, and both Russell & Co. and the Reporter for any subsequent negligent damage.

There is nothing in those relations or in the charter-party that can serve to charge the master of the Reporter with any responsibility for the negligence of the Esmeralda, or of Russell & Co., before the transhipment at Hong Kong. The teas might have been damaged by such prior negligence far beyond the amount of the whole freight. It could not be contended that the Reporter, or her master, upon any evidence in this case, could be made liable for any such excess of damage; and, if not liable for the excess of damage, whatever it might be, how can she be made liable for any part of it that was not occasioned by her own fault? And, if not liable for any part of the damage, none can be legally offset against her just claim for freight. There was nothing in this case to mislead either the shippers at Amoy, or their vendees, the respondents here, as to the rights of the Reporter, or as to the per-

sons whom they must hold liable for damages arising on different parts of the whole transportation; because the original bill of lading, on its face, stated that the goods were received upon "the Esmeralda, bound for Hong Kong, for transhipment to the American ship Reporter, for New York." This did not import a joint adventure or a joint undertaking by the Esmeralda and the Reporter to carry the goods safely from Amoy to New York. The signature to the Esmeralda's bill of lading, "RUSSELL & Co., charterers of Reporter," showed, indeed, that Russell & Co. were the charterers of the Reporter; but any inquiry as to the terms of the charter would have shown that the Reporter sailed as an independent ship, having her own right to the freight earned by her, and that Russell & Co. were not owners *pro hac vice*. The very language of the signature to the bill of lading imports a charter of affreightment, because, had Russell & Co. chartered her as owners *pro hac vice*, no such term as "charterers" would have been employed. The transportation in that case would have been a transportation by Russell & Co. in their own vessels, *pro hac vice*, from Amoy to New York. The authority to Russell & Co. from the shippers at Amoy to tranship the goods at Hong Kong to the Reporter, which, as the signature to the bill of lading indicated, was a vessel belonging to different owners, sailed by themselves and on their own account, was an authority to tranship upon the usual terms of charters of affreightment, that is, subject to a lien upon the goods for the Reporter's own freight, and consequently subject to an obligation upon the shippers or their indorsee to pay her freight, if they received the goods under her bill of lading. So without reference to the charter, it could not be supposed by the shippers at Amoy, or by the indorsees of the original bill of lading, that in the ordinary course of trade, and upon a bill of lading like the Esmeralda's, an independent ship, to which goods were to be transferred at Hong Kong, was to carry them to New York without freight in case the goods should have been previously damaged by no fault of the Reporter. A rule of law which should work that result would not only violate the intent of the parties, but would be greatly prejudicial to maritime commerce, since plainly no vessel would be chartered or run under such conditions.

Upon bills of lading where no transhipment is provided for, if the vessel is under the necessity of transhipping the goods at an intermediate port, through disasters at sea, it is said by the supreme court in the case of *Hugg* v. *Augusta Ins., etc., Co.*, 7 How. 595, 609, that "the owner of the cargo is liable for any increased freight arising from the hire of another vessel." *Searle* v. *Scovell*, 4 Johns. Ch. 218; *Worth* v. *Mumford*, 1 Hilt. 1. Doubtless, communication with the owner, where practicable, ought to be had. *Gibbs* v. *Grey*, 2 Hurl. & N. 22, 31; *Matthews* v. *Gibbs*, 3 El. & El. 282, 303. The right in such cases to recover any excess of freight is doubtless a controverted question, and depends upon the view taken of the extent of the master's authority. See Emerigs, Ins. (Meredith's Ed.) 342, 345; Pardessus, Droit Com. 644, 715; Boulay-Paty, Droit Mar. 400, 405. *Contra*, 1 Valin, Comm. 651, 653; Poth. Charter-parties, 68.

In the case of *Matthews* v. *Gibbs, supra,* the negative was held, in the absence of any authority from the consignee, while the contrary opinion is expressed in *Hugg* v. *Augusta Ins., etc., Co., supra.* But, where the original shipment itself provides for transhipment upon another vessel, no question of the right of the first carrier to tranship can be raised, and the right of the latter ship to claim her own just freight, unaffected by the faults of the former, seems to me necessarily implied from the nature of the contract. Here there was no excess of freight contracted for or claimed, and the prior faults of the Esmeralda or of Russell & Co. cannot be chargeable, in whole or in part, against the Reporter. *Clark* v. *Barnwell,* 12 How. 272, 283. The respondents were the owners of the teas at the time of the discharge. They received them by means of the Reporter's bills of lading, and not otherwise. They therefore became bound personally to pay the freight which the Reporter was justly entitled to for her carriage, and which was expressly made payable on delivery at New York, subject only to such offset as was a legal liability of the Reporter; and the libelant can recover in this action, just as he could have enforced his right by his lien on the goods.

Had the claim to freight stood only upon the right of Russell & Co., doubtless it would have been subject to be offset by the damage which was a legal demand against Russell & Co. But such is not the nature of the libelants' claim. They sue, not upon any right of Russell & Co., but upon the right of the Reporter, as an independent carrier from Hong Kong, a right which is impliedly recognized and provided for in the original bill of lading.

Where a new bill of lading is given upon a transhipment, it is said to be usual to make the goods "deliverable to the holders of the original bill of lading, duly indorsed, to prevent conflicting claims under the two bills of lading." Scrutton, Charter-parties, art. 56, p. 115. In the present case the form of the second bill of lading, to "Russell & Co., *as agents,*" was evidently designed for the same purpose. Its meaning is that the goods were to be delivered, not to Russell & Co. for themselves, but as the property and for the benefit of whoever held the original bill of lading given by Russell & Co. Upon the delivery and transfer of the Reporter's bill of lading by Russell & Co. to the respondents, the owners of the property, and their surrender of the former bill of lading, the legal effect became the same as if the Reporter's bill of lading had been directly to the respondents.

Upon arrival here, the agents of Russell & Co. appear to have acted also as the agents of the Reporter in collecting the freights. The bills for the freight rendered by Russell & Co.'s agents show that the claim against the respondents was for freight due "to owners of American ship Reporter." In the subsequent settlement by Russell & Co. with the local agents of the ship here for the $10,000 charter money, the claim in suit uncollected was turned in as a part payment, and the balance only appears to have been paid to the libelants in cash.

There is no evidence to show that the whole amount of this freight was not needed to make up the charter money due to the Reporter. It does

not appear whether the whole freight-list amounted to $10,000 or not, or how much was collected aside from this claim. Had the whole freight moneys been more than enough to pay the $10,000 charter money aside from the present claim, and had Russell & Co.'s agents, in behalf of the Reporter, collected more than that amount, and the owners of the Reporter had thereupon suffered Russell & Co., in the settlement made with them, to retain any surplus in money, while they undertook to collect in full the claim against the respondents, knowing that the latter had a good offset to the demand against Russell & Co., in whole or in part, such a settlement would be deemed inequitable, as against the respondents, and would, I think, have entitled the latter to set up their offset against the libelants' claim as an equitable defense; on the ground that the plaintiffs, having two funds for the satisfaction of their demands, had no equitable right to select the one which would work a known injustice to the respondents, whom Russell & Co. were bound to protect. No such defense is pleaded, and the facts necessary thereto do not appear in the proof, and the libelants are therefore entitled to a decree.