## HALL CORPORATION OF CANADA v. CARGO EX STEAMER MONT LOUIS AND SUBFREIGHTS THEREON (STOLTZ, Intervener).

### No. 164.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1933.

Stanley & Gidley, of Buffalo, N. Y. (Ray M. Stanley, of Buffalo, N. Y., of counsel), for claimant-appellant Lamborn & Co., Inc.

Brown, Ely & Richards, of Buffalo, N. Y. (David S. Jackson, of Buffalo, N. Y., of counsel), for libelant-appellee.

Burke & Desmond, of Buffalo, N. Y. (Charles S. Desmond, of Buffalo, N. Y., of counsel), for intervener-appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

On March 28, 1929, the appellant Lamborn & Co. entered into a contract of affreightment with the American General Shipping Corporation by the terms of which an unnamed vessel was to sail to Cardenas, Cuba, and there load a full and complete cargo of refined sugar in bags, delivered by the factors of Lamborn & Co., and to proceed with the cargo, as ordered by Lamborn & Co., with all convenient speed, to Buffalo, Cleveland, and Detroit, at the charterer's option. Fifty per cent. of the estimated freight was to be paid upon receipt of cable advice that the bills of lading had been signed, and the balance of freight was to be paid in cash upon cable advice of right delivery of cargo and the net delivered weight ascertained at destination. It was agreed that sufficient cash for the ordinary disbursements of the steamer was to be advanced if required on account of freight on signing bills of lading, subject to 3 per cent. to cover insurance and all other charges. The master was to sign bills of lading on approved forms, without prejudice to the terms of the contract in question, and the quantities stated in the bills of lading were to be conclusive evidence against the ship as to the number of bags shipped, errors and obvious fraud excepted, and the ship was responsible for any quantity short delivered of signed bill of lading quantity. The ship was responsible for any loss sustained in the event of the bags being cut and also for loss and dam-

age to cargo due to improper or insufficient dunnage or stowage. The cargo was to be discharged by the steamer in railroad cars or on dock at the charterer's option. A clause provided: "Penalty for non-performance of this Charter proved damages, not exceeding estimated amount of freight." By an addendum it was agreed that the cargo to be laden on the vessel would be transhipped at a St. Lawrence river port into two bottoms of approximately equal quantities, the first bottom to be loaded concurrently with ocean steamer discharge, and the second bottom to be loaded fifteen or thirty days later at the charterer's option, and that the charterer should have the option of discharging each bottom at one or two ports out of Cleveland, Buffalo, or Detroit.

The American General Shipping Corporation named the steamer Halse, chartered under a standard produce government form charter, to perform the contract. It loaded 73,000 bags of sugar and issued three bills of lading, one covering 35,000 bags for Buffalo, one 5,000 for Detroit, and one 33,000 for Cleveland. The bills of lading recited: "This B/L is subject to all terms, conditions and exception of charter party dated * * * and to all addendums thereto anything herein to the contrary notwithstanding."

The steamer arrived at Montreal in the latter part of May, 1929. On May 25, 1929, the American General Shipping Corporation entered into a time charter, standard produce government form, for the use of the steamer Mont Louis, agreeing to pay hire therefor of $330 per day, payable 10 days in advance. On May 15, 1929, it also entered into a charter of the steamer Boreas, using the same standard produce government form; charter hire being payable semimonthly in advance, the ship being placed at the disposal of the charterer on May 31. The cargo destined for Buffalo and Detroit was laden aboard the steamer Mont Louis, and that destined for Cleveland upon the steamer Boreas at Montreal. The transhipment commenced May 31, 1929. Neither vessel issued new bills of lading, and the respective cargoes passed the customs, and delivery was made on the original bills of lading issued by the steamer Halse.

When the Mont Louis delivered her cargo at Detroit and Buffalo, it was 166 bags short of the amount specified in the bills of lading. The Boreas at delivery contained 58 bags more than the bills of lading specified. Total shortage was 108 bags. There is a claim by the appellant Lamborn & Co. that some of the bags of sugar were damaged through negligence. Lamborn & Co. had no knowledge, until the day after the transfer, upon what ships the cargoes were transhipped, nor is it claimed that they had knowledge of the charters between the American General Shipping Corporation and the owners of the Mont Louis and Boreas.

When the Mont Louis arrived at Detroit, the American General Shipping Corporation defaulted on its contract respecting unloading; it did likewise at Buffalo. Lamborn & Co. assumed the obligation of unloading the cargo. The American General Shipping Corporation failed to pay the second installment of the charter hire of the Boreas due on June 15. The Boreas served notice on June 14th, after the cargo had been partially unloaded, that it would discharge the remainder of the cargo subject to its lien for charter hire. The court below found that there was a balance of freights prior to the separation of the cargo in the sum of $8,601.91; that there was a balance of unpaid freights as between the steamers Mont Louis and Boreas; that the stevedores had a set-off for their charges at Buffalo and Detroit of $1,753.15, leaving a balance of freight apportioned to the Mont Louis of $2,977.90. After deductions and set-offs against the freights apportioned to the Boreas for stevedoring charges, damage to the cargo, and advances to the captain, a total of $3,394.34, there was a balance of $476.52. The court found damage to the cargo laden on the Mont Louis of $2,058.11 and loss resulting from shortage of cargo of $340.75.

The theory of the libel is that the appellees have liens against the cargoes and the subfreights thereon. The charters of the Mont Louis and Boreas provided: "That the Owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this Charter. * * *"

The amount due under the charter was $8,601.91. The court below deducted from the gross freights all set-offs which occurred prior to the transhipment of the cargo at Montreal, and allocated amounts to the Mont Louis and Boreas in proportion to the respective portions of cargo carried by each vessel; 55 per cent. of the amount being carried by the Mont Louis and 45 per cent. by the Boreas. From the amount apportioned to the Mont Louis, there was deducted the stevedoring and other charges at Buffalo and Detroit, and, from the balance so apportioned to the Boreas, there was deducted the stevedoring and other charges at Cleveland, loss

from damage to her cargo, and advances made by Lamborn & Co. to her master, leaving the balance above stated.

The appellant Lamborn & Co., owing the subfreights, makes a claim of a possessory lien for damage to its cargo, and asserts this lien against the lien of the Hall Corporation. The charter of the appellee provided for a lien against subfreights and cargo in section 18, quoted supra. Sections 4 and 5 providing for payment of hire in advance is consistent with section 18 providing for liens.

■ The shipowner has a maritime lien for charter hire on cargo and freights where a lien is reserved initially in the original charter and has priority over rights subsequently created. The Kimball, 3 Wall. 37, 18 L. Ed. 50; Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47; Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., 115 F. 669 (C. C. A. 1); Actieselskabet, etc., v. Harrison & Co. (D. C.) 260 F. 287; The Albert Dumois (D. C.) 54 F. 529; Fourteen Horses, etc., Fed. Cas. No. 4990. But this lien may be waived by inconsistent provisions. Raymond v. Tyson, supra. But it is not waived if expressly reserved. Actieselskabet, etc., v. Harrison & Co., supra; Fourteen Horses, etc., supra. The lien may be asserted to the extent of freights due to the charterer (Jebsen v. A Cargo of Hemp [D. C.] 228 F. 143; The Albert Dumois [D. C.] 54 F. 529; Matter of Solhaug [D. C.] 2 F. Supp. 294, 1931 A. M. C. 640), except where the charterer has been paid in good faith without notice of the shipowner's rights (American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., supra; Actieselskabet, etc., v. Harrison & Co., supra).

These cases involving a lien reserved in the original charter show the operation and extent of the lien, but do not determine the initial validity of the lien in the instant case. The lien here arose in a contract made after the original contract of affreightment, and the question is the authority of the charterer to bind the cargo owner by the latter contract. The St. Hubert, 107 F. 727, 732 (C. C. A. 3), involved bills of lading issued in Calcutta for a through shipment to Philadelphia which reserved the right to tranship. The goods were transhipped to the St. Hubert at London, and the usual ocean bill of lading issued to the original carriers provided that the shipowner would not be liable for damage to goods if notice were not given before removal of the goods. On arrival, the goods were examined, found to be wet and damaged,

were removed and sold, and the insurer of the cargo attempted to charge the ship with the loss. It was held that the parties were bound by the provision for notice of damage. The court said:

"The general course of business in forwarding when the ship of the signer of the through bill of lading does not go all the way to the port of ultimate destination, and of which fact the through bill of lading gives notice, and the manifest necessity of the case that the through undertaker should transship under such contract as he can reasonably make, justifies the presumption of the requisite authority, in the absence of any notice of want thereof brought to the knowledge of the new carrier."

■ As stated in the instant case, the contract of affreightment provided for transhipment, and the clause giving a lien is reasonable and usual. It must be held effective and binding on the owner of the cargo. If this be so, the lien may be satisfied to the extent of the subfreights due from Lamborn & Co. unless a set-off for damages to the cargo may be made. Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; American Steel Barge Co. v. Chesapeake & O., etc., Co., 115 F. 669 (C. C. A. 1); Wehner v. Dene S. S. Co., [1905] 2 K. B. 92. The set-off for alleged damage to a cargo should not be allowed. In Sumner v. Walker (D. C.) 30 F. 261, it was held, where tea was transhipped, that the delivering carrier could recover freight not subject to a set-off for damage by the initial carrier. At bar, the court found that the cargo was not damaged while in the possession of the Mont Louis. By the principle of the Sumner Case, there can be no set-off. The bills of lading originally issued by the Halse, with the right of transhipment, provided that they were "subject to all terms, conditions and exceptions of charter party." The use of this phrase means that the charter parties referred to were the time charter of the Halse in so far as the voyage from Cardenas to Montreal was concerned and to the respective charters of the Mont Louis and Boreas later in so far as the shipment from Montreal to ultimate destinations was concerned. Upon the union of the vessels and their cargoes, there arose immediately reciprocal liens between the ships and cargoes, and reciprocal obligations between the appellees and the appellant. The ships were obliged to properly load, stow, and care for the cargo. The cargoes were subject to the maritime liens for breach of settled obligations. The owners of the ships as the carriers in possession of the cargoes became liable in personam for the breach of

such obligation. It follows that, with such obligations to the cargoes, there is no inconsistency in holding that the cargoes are subject to the usual lien in favor of vessels for freight or charter hire to the extent of the freight which the cargo owner agreed to pay and which remained unpaid.

Nor was there a breach by refusal to deliver until after the libel had been filed and a bond given. These efforts to preserve the liens did not waive them, and the liens were not prematurely filed. Fourteen Horses, etc., supra.

On this proof, we agree with the court below that Lamborn & Co., Inc., failed to establish negligence or fault of either carrier of the cargoes. The appellant asserts, in support of its set-off, that there is a presumption created by the bills of lading acknowledging receipt of cargo in good condition by the Halse, but the court found that that presumption was overcome by proof, and the appellant has failed to carry its burden of establishing negligence. We agree with this conclusion. Cummings v. Pennsylvania R. Co., 45 F.(2d) 152 (C. C. A. 2); The G. R. Crowe, 294 F. 506 (C. C. A. 2); The C. R. Sheffer, 249 F. 600 (C. C. A. 2); The Fri, 154 F. 333 (C. C. A. 2); The William I. McIlroy (D. C.) 37 F.(2d)) 909.

Decree affirmed.