In re STERLING NAVIGATION CO., LTD., Bankrupt.

COUNCIL COMMERCE CORPORATION, Plaintiff,

v.

STERLING NAVIGATION CO., LTD., A/S Gerrards Rederi, a Corporation, and Agency for International Development, Defendants.

Bankruptcy No. 75 B 1955 (EJR).

United States Bankruptcy Court, S. D. New York.

Nov. 18, 1981.

490

Zalkin, Rodin & Goodman, New York City, for Sterling Navigation Co., Ltd.

Freehill, Hogan & Mahar, New York City, for A/S Gerrards Rederi.

## DECISION ON MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

EDWARD J. RYAN, Bankruptcy Judge.

On October 28, 1975, Sterling Navigation Co. ("Sterling") filed a petition under Chapter XI of the Bankruptcy Act and was thereafter, on December 17, 1975 adjudicated a bankrupt. On February 23, 1976, an

involuntary petition in bankruptcy was filed against Sovereign Marine Lines, Inc. ("Sovereign"), and on March 22, 1976, Sovereign was adjudicated a bankrupt. The Sovereign and Sterling estates were substantively consolidated on January 18, 1981.

Prior to their respective adjudications, Sterling and its agent Sovereign were engaged in the business of chartering ships and maintaining cargoes. In December 1974, Sterling entered into a charter agreement with A/S Gerrards Rederi ("Gerrards"), whereby Sterling, as charterer, agreed to hire the M/S Regal Sword (the "Regal") for a period of at least 33 months, at an agreed upon rate, payable semimonthly in advance. The Regal was delivered to Sterling on January 1, 1975.

In June 1975, Sterling entered into an agreement with the Bangladesh Agricultural Development Corporation for the carriage of a cargo of urea (the "urea cargo"). Payment of the freight rate was conditionally guaranteed by the Agency for International Development ("AID"), an agency of the Department of State of the United States Government, pursuant to a commitment letter dated July 24, 1975, as amended August 25, 1975.

Similarly, on July 8, 1975, Sterling contracted with A. Halcoussis Shipping Ltd. ("Halcoussis") for the carriage of a cargo of grain (the "grain cargo") to Bangladesh.

The charter hire due Gerrards on September 1, 1975, and on all subsequent dates has not been paid by Sterling. Gerrards subsequently took back possession of the Regal and now asserts a lien on all funds due to Sterling as a result of the carriage of the urea and grain cargoes.[1] The alleged contractual maritime lien is asserted by Gerrards pursuant to clause 18 of the Gerrards Charter, which provides, inter alia, "that the owners shall have a lien upon all cargoes and all sub-freights due under this Charter ...." Gerrards, however, had not

---

1. The urea and grain Cargoes were delivered to Bangladesh and, pursuant to orders of this Court entered June 17, 1976 and February 17, 1978, respectively, AID paid the sum of $282,445.25 for the urea freight and Bangladesh paid

$140,000 for the grain freight (collectively, the "Funds"). The Funds have been held in interest bearing accounts, pursuant to said orders, pending determination by this court as to whom the Funds belong.

filed UCC–1 forms with respect to said contractual maritime liens as of the initiation of the bankruptcy proceedings.

On February 10, 1981, Sterling filed a motion for summary judgment seeking to have declared invalid Gerrards' purported lien on certain monies paid by AID to the Trustee and by Bangladesh to the Trustee, together with interest thereon; and, seeking a determination that the Funds belong to the Trustee. Gerrards cross-moved, soon thereafter, for summary judgment in its favor directing the Trustee to pay over to it $316,400 from the Funds, together with a pro rata portion of the interest earned on said Funds.

The issues before this court are twofold:

(1) Whether the New York Commercial Code's filing requirements apply to a shipowner's lien on subfreights in a maritime charter; and (2) if so, whether the filing requirements, which vary throughout the states, are unconstitutional in that they significantly impair the uniform nationwide application of maritime law.

■ The present case involves a security interest in subfreights contained in a lease, or charter of a maritime vessel. *In re Leckie Freeburn*, 405 F.2d 1043 (6th Cir. 1969), a case similar to the one at bar, involved a security interest in machinery and equipment contained in a lease of the right to mine coal. The court in that case held that "Since the security interest was created in personal property, it is governed by the Uniform Commercial Code." *Id.* at 1046. Similarly, in the instant case, while the charter is arguably a "true lease" and is thereby excluded from Article 9 coverage by virtue of Uniform Commercial Code ("UCC") § 1–201(37), the lien on subfreights incorporated in the charter is a separate and distinct security interest, and is therefore subject to Article 9 requirements. Under UCC § 9–106, "all rights incident to the charter are 'accounts'." Thus, the lien on subfreights, like a lien on accounts, is subject to Article 9 provisions, and filing of the security interest is required in order to obtain priority over a trustee in bankruptcy.

■ The fact that in *Leckie*, the debtor owned the collateral at the time he entered the lease, whereas in the instant case the rights to payment for shipping cargoes could only be acquired after the cargoes were actually shipped, which was subsequent to the time of the charter, is of no material consequence. UCC § 9–204(1) and Comment 1 thereof, clearly establish that a security interest in after-acquired collateral has equal status with an interest in collateral in which the debtor has rights at the time of the agreement. *Leckie*, therefore, is not distinguishable on these grounds from the case at bar. Since, under the charter, as in *Leckie*, the owner acquired a security interest in personal property (i. e., the subfreights, which are treated as "accounts"), this interest is subject to Article 9 coverage.

Counsel for Gerrards, however, assert that the entire original charter, along with the lien on subfreights is totally excluded from Article 9 coverage, and that the application of UCC § 9–106 is limited to subsequent transfers of that interest by the owner as collateral for say, a loan from a bank. As previously noted, however, pursuant to UCC § 9–106 the lien on subfreights is treated as a security interest in "accounts." This language implies that the initial transfer of the lien on subfreights is subject to Article 9 provisions, as well as any subsequent transfer of that interest. Had the intent of the Legislature been to exclude the lien on subfreights included in the original charter, they could have expressly so provided, as they did with respect to a true lease (§ 1–201(37)), or an interest in real estate (§ 9–104(j)). A provision of this sort, when interpreted in light of UCC § 9–102(3), would have led to the treatment of a lien on subfreights similar to that of a promissory note secured by a real estate mortgage, i. e., excluding the original transaction from Article 9 coverage (pursuant to UCC § 9–104(j)), while applying Article 9 to any subsequent transfers of that interest (pursuant to UCC § 9–102(3)). *See* Comment 4 to UCC § 9–102(3). Absent a provision of this nature, though, it would contravene the plain meaning of UCC § 9–106 to exclude an otherwise applicable security interest from Article 9 coverage.

Counsel for Gerrards further maintain that since the terms of the charter party are valid even if oral, there can be no requirement that the lien on subfreights be filed.

While it is true that the essential terms of a charter party need not be in writing to be valid,[2] there is no basis for the contention that the optional lien on subfreights can be created without a written clause providing for said lien. The court in *N. H. Shipping Corp. v. Freights of the S/S Jackie Hause*, 181 F.Supp. 165 (S.D.N.Y. 1960), stated that where the cargo is not owned by the charterer, it is essential in order to protect the owner's lien to provide for it in the charter, and thus give notice to the cargo owner of the vessel's claim against the charterer's right to the freights. *Id.* at 169; *See also, Hall Corp. of Canada v. Cargo Ex Steamer*, 62 F.2d 603, 605 (2d Cir. 1933); *Norgulf, supra* at 904.

Therefore, since Article 9 of the UCC is applicable to a security interest in subfreights contained in a maritime charter and, since Gerrards, the shipowner, failed to file financing statements to perfect its alleged contractual maritime liens, the purported liens are void as against the trustee who is entitled to the funds currently held in interest bearing accounts pursuant to order of this court.

An issue addressed by the parties in their respective memoranda, and which this court inquired into at the March 9, 1981 hearing, concerns the constitutionality of the UCC filing requirements as applied to purported maritime liens, in that the filing requirements, which vary throughout the states, might significantly impair the uniform nationwide application of maritime law.[3]

In deciding whether a state law affecting maritime affairs is constitutional the inquiry to be made is the extent to which such regulation actually impairs the uniformity of admiralty law as applied throughout the states. *Askew v. American Waterways*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973).

The Supreme Court in *Askew, supra,* held that a state may establish rules "even though these rules incidentally affect maritime affairs, provided that the state action does not ... work any prejudice to the *characteristic* features of maritime law, nor interfere with its proper harmony and *uniformity* in its international and interstate relations." *Id.* at 339, 93 S.Ct. at 1604 (emphasis added). This limitation, however, "still leaves the States with a wide scope." *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 368 (1959). "In the field of maritime contracts, as in that of maritime torts, the National Government has left much regulatory power in the States." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955).

Thus, a state law which is a valid exercise of the state's regulatory powers, or which supplements without conflicting with maritime law, will not be determined unconstitutional as applied to maritime law, even though the state law might affect the uniformity of maritime law. Similarly, a state law which is merely procedural in nature and which does not conflict with the substantive aspects of maritime law, ought not be determined unconstitutional as applied to maritime law.

The issue in the present case is whether New York's UCC filing requirement is substantive in nature or affects the substantive features of maritime law, the variation of which among the states would substantially impair the uniformity of maritime law; or, whether the filing requirement is simply a procedural requirement which only incidentally affects admiralty situations but does not contravene any of the essential characteristics of general maritime law.

Similar inquiries into the substantive-procedural distinction have been made in the

2. *Norgulf*, 214 F.Supp. 899 (S.D.N.Y.1962).

3. *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

context of diversity jurisdiction cases. Under the holding of *Erie RR. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, federal courts, when sitting in diversity cases, are required to apply state substantive law and federal procedural requirements. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), was a diversity case which involved conflicting federal and state regulations with respect to service of process. In applying the line of cases, the Court held that the manner of service of process in a diversity action is governed by Federal Rules of Civil Procedure. In so holding, the Court rejected the defendants' argument that because failure to comply with the federal procedure would ultimately affect the outcome of the case, it must be considered substantive. Rather, the Court reemphasized the test of *Sibbach v. Wilson & Co., Inc.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), which held that "[t]he test must be whether the rule really regulates procedure, —the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Id.* at 14, 61 S.Ct. at 426, 85 L.Ed. at 479. *See also, Boggs v. Blue Diamond Coal Co.*, 497 F.Supp. 1105, 1116 (E.D.Ky.1980).

The filing provisions in the instant case are analogous to service of process requirements in *Hanna, supra.* The State of New York, through its Commercial Code, has stated that it is in the interests of its citizens that a secured creditor give notice to other possible creditors and bona fide purchasers of its claims to these particular assets. These provisions, therefore, cannot be viewed as anything other than rules regulating procedure, and therefore do not work material prejudice to the uniformity of admiralty law. The rights and duties imposed by admiralty law are not altered and the uniformity of substantive admiralty law is not materially prejudiced. Therefore, the filing provisions of New York's Uniform Commercial Code are constitutional as applied to maritime affairs. Since the filing requirements were not met by Gerrards, the funds, with accrued interest, belong to the trustee whose motion for summary judgment is granted.

Settle an appropriate order.