In Re STERLING NAVIGATION CO., LTD., Bankrupt.

COUNCIL COMMERCE CORPORATION, Plaintiff,

v.

STERLING NAVIGATION CO., LTD., A/S Gerrards Rederi, a corporation, and Agency for International Development.

No. 82 Civ. 2081 (RLC).

United States District Court, S.D. New York.

July 13, 1983.

Freehill, Hogan & Mahar and Haight, Gardner, Poor & Havens, New York City, for A/S Gerrards Rederi; Phillip V. Moyles and William J. Honan, III, Gary D. Sessar, Mark C. Flavin, New York City, of counsel.

Zalkin, Rodin & Goodman, New York City, for Harvey R. Miller, Trustee in Bankruptcy.

Zock, Petrie, Reid & Curtin, New York City, for Soutos Hellas Maritime Corp.

## OPINION

ROBERT L. CARTER, District Judge.

*Background Facts and Proceedings Below*

This is an appeal by the shipowner, A/S Gerrards ("Gerrards"), from a decision of the Bankruptcy Court granting summary judgment to the Trustee of the estate of Sterling Navigation Co. ("Sterling"), on a motion to declare invalid a shipowner's maritime lien on subfreights which had not been perfected under Article 9 of the New York Commercial Code ("Article 9 of the Code"). The shipowner in that action appeals the Bankruptcy Court's decision and cross moves for summary judgment pursuant to Rule 56, F.R.Civ.P. It contends that its maritime lien on subfreights is not subject to Article 9 and would thus have priority over the Trustee without the need to file, i.e. perfect under that Article. The case appears to be one of first impression.[1]

to pursue this avenue, a brief stay would seem advisable.

1. There have been several cases decided before the code amendments at issue which discuss the priority between the Trustee in bankruptcy and the shipowner in the subfreights. *See, In re North Atlantic & Gulf Steamship Co.,* 204 F.Supp. 899 (S.D.N.Y.1962) (Bryan, J.), *aff'd*

*sub nom., Schilling v. A/S D/S,* 320 F.2d 628 (2d Cir.1963).

*Diana Compania Maritima v. Subfreights S.S. Admiralty Flyer,* 280 F.Supp. 607 (S.D.N.Y. 1968) (Herlands, J.), was decided after the 1966 amendments; however, the 1962 Code which did not mention ship charters was used since the charter party in that case was signed in

On December 13, 1974, Gerrards and Sterling entered into a charter party agreement in which Sterling as charterer agreed to hire the M/S Regal, Gerrards ship, for at least thirty-three months. Trustee's Brief in Support of its Motion at 3–4. Under the charter agreement, Sterling was to use the ship to transport merchandise and was to pay Gerrards at an agreed hire rate semimonthly in advance. *Id.* at 4.

The charter contract utilized was the New York Produce Exchange Form which allowed Sterling to trade the vessel worldwide within Institute warranty limits. Some of the standard provisions were altered,[2] however, Clause 18, which granted the owner a lien on all subfreights, was retained. That section stated in relevant part: "... the Owners shall have a lien upon all cargoes and all subfreights ... due under this Charter..." Affidavit of Joseph de Carlo, Exhibit A, Clause 18. It is undisputed that this lien was never perfected by Gerrards. Trustee's Statement Under Local Rule 3(g) at ¶ 14;[3] Gerrards' Statement Under Local Rule 3(g) at ¶ 1.

Pursuant to the charter agreement, Gerrards delivered the M/S Regal to Sterling on January 1, 1975, in Kawasaki, Japan. Thereafter, Sterling entered into two subcharter agreements; the first on June 27, 1975, with the Bangladesh Agricultural Development Corporation ("Development Corporation")[4] for the carriage of a cargo of urea to Bangladesh, and the second on July 8, 1975, with A. Halcoussis Shipping Ltd. ("Halcoussis") to transport grain[5] to Bangladesh. Trustee's Brief in Support of its Motion at 4. The agreement with the Development Corporation provided that the United States Agency for International Development ("AID") would issue a letter of commitment[6] agreeing to pay Sterling for the urea freight. Trustee's Statement under der Local Rule 3(g) at ¶ 6.

Sterling defaulted on the charter for hire on September 1, 1975. Gerrards' Brief in Support of its Motion at 3. As a consequence, Gerrards withdrew the M/S Regal from Sterling, but only after the grain and urea cargoes had been delivered as scheduled. *Id.* On October 17, 1975, Gerrards exercised its maritime lien on the subfreights under Clause 18, by serving notices of lien on the Peoples Republic of Bangladesh and on AID in Washington, D.C. *Id.* at 4. Gerrards then brought an enforcement action on the lien in the District Court for the District of Columbia. *Id.* That same day, October 28, 1975, Sterling filed a Chapter XI petition in this District. *Id.* It was adjudicated a bankrupt on December 17, 1975. Trustee's Statement Under Local Rule 3(g) at ¶ 1.

On February 23, 1976, an involuntary petition in bankruptcy was filed against Sterling's general agent, Sovereign Marine

---

1965, and the charterer was adjudicated bankrupt before the 1966 amendments became effective. *See id* at 610–611.

2. The New York Produce Exchange Form provided that disputes would be arbitrated in New York City; however, Sterling and Gerrards modified the form to substitute London as the arbitration forum. See, Affidavit of Joseph De Carlo, Exhibit A, Line 115.

3. Both the Trustee and Gerrards filed statements under Local Rule 9(g) which was subsequently changed to the present Local Rule 3(g) effective as of October 31, 1980.

4. The Bangladesh Agricultural Development Corporation is an arm of the Peoples Republic of Bangladesh, hence explaining why Gerrards served notice of its lien on the Peoples Republic of Bangladesh, *see infra* text at 620. Gerrards' Brief in Support of its Motion at 2–3.

5. The Trustee has also brought a motion for summary judgment, against Soutos Hellas Maritime Corp. ("Soutos"), on the grounds that a letter of credit allegedly assigned to Soutos by Sovereign Marine Lines, Sterling's general agent, did not grant a security interest in the assets comprising the grain fund. The Trustee further argued that: (1) the letter of credit expired by its terms without being drawn upon and (2) Soutos failed to perfect its security interest. The letter of credit assigned to Soutos was obtained by Halcoussis for the benefit of Sovereign, which then assigned its interest to Soutos. Soutos does not oppose the motion; therefore, the Trustee's motion for summary judgment against Soutos is granted.

6. The letter of commitment was dated July 24, 1975, and was later amended August 25, 1975.

Lines, Inc. ("Sovereign"). *Id.* The latter was adjudicated bankrupt on March 22, 1976. *Id.* Subsequently, the Sterling and Sovereign estates were consolidated by a January 18, 1980 order of the Bankruptcy Court. *Id.* By further orders of that court of June 17, 1976, and February 17, 1978, the freights due for the carriage of the urea and grain cargoes were paid to the Bankruptcy Court and there held in an interest bearing account pending a determination of priority and ownership of the funds. *Id.* at ¶ 15.[7]

Against this factual backdrop, the Bankruptcy Court held that Article 9 of the Code as amended in 1977 governed Gerrards' maritime lien on subfreights and that its failure to file, in accordance with the procedures therein, destroyed its claim for priority over the Trustee. *In re Sterling Navigation,* 15 B.R. 489, 492 (Bkrtcy.S.D.N.Y.1981). At the outset, we conclude that the Bankruptcy Judge was in error in applying the 1977 amendments to the Code to the case at bar. Since at the latest, the priority of the parties was fixed on October 28, 1975, when Sterling filed its petition in bankruptcy, the provisions of the Code in effect prior to the 1977 amendments were applicable. See, N.Y. [Uniform Commercial Code] §§ 11–101, 11–107 (McKinney 1964).

Section 11–107 reads as follows:

> .... Original Article 9 shall apply to any questions of priority if the positions of

the parties were fixed prior to the effective date of Revised Article 9 . . .

Section 11–101 defines Original Article 9 as the article as adopted in 1962 as amended; Revised Article 9 refers to the new Article adopted in 1977.[8] The difference between Original Article 9 and Revised Article [9] was a change in the designation of a charter party from a "contract right" in 1966 to an "account" in 1977. Since under Original or Revised Article 9, both "accounts" and "contract rights" must be filed in order to be perfected, *id.* N.Y. [Uniform Commercial Code] § 9–302 (McKinney 1964), the Bankruptcy Judge's mistaken reliance on the 1977 amendment resulted in a cosmetic rather than a fatal error. My basic disagreement with the Bankruptcy Judge is with his conclusion that the shipowner's maritime lien was subject to Article 9's filing requirement.

Section 9–105(1)(b) of Article 9 as amended in 1966, provided in pertinent part:

> 'Chattel paper' means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods; but a charter or other contract involving the use or hire of a vessel is not chattel paper . . .

Section 9–106 stated in part:

> ... All rights earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter are contract rights

---

**7.** As of January 14, 1981, the urea fund consisted of $472,633.20 with accrued interest. As of January 2, 1981, the grain fund was $182,-914.72 with accrued interest. Gerrards and the trustee have stipulated that if the court determines that Gerrards has a valid and enforceable lien, it will be in the amount of $316,400 together with a *pro rata* portion of the interest earned on the funds. Trustee's Statement Under Local Rule 3(g) at ¶ 15–16.

**8.** N.Y. [Uniform Commercial Code] § 11–101 (McKinneys 1964) reads as follows: ".... (a) The term 'Original Article 9' of the uniform commercial code as enacted by chapter five hundred fifty-three of the laws of nineteen hundred sixty-two and as amended by chapter eight hundred ninety-nine of the laws of nineteen hundred seventy. (b) The term 'Revised Article 9' means Article 9 of the uniform com-

mercial code as amended by the act enacting this Article."

The "Practice Commentary" by Lester E. Dennon accompanying Section 11–101 provides: This section defines as Original Article 9, the Article 9 as adopted in 1962 as amended, and Revised Article 9 as the new Article adopted in 1977.

**9.** *Id.* § 1–201(37) provides in part:

"(37) .... Unless a lease or consignment is intended as security reservation of title thereunder is not a 'security interest' ...."

Section 9–104(j) provides in part:

"This Article does not apply....

(j) except to the extent that provision is made for fixtures in section 9–313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder; ...."

and neither accounts nor general intangibles.

Gerrards asserts that as a matter of federal maritime law, the owner's contractual maritime lien in subfreights is superior to the Trustee's non maritime lien, Gerrards' Brief in Support of its Motion at 9, and that the purpose of the 1966 amendments was to clarify the filing requirements for the assignment of ship charters, since for perfection purposes, the charters could arguably be considered chattel paper, accounts, general intangibles or contracts. *Id.* at 43–5. Moreover, Gerrards contends that a ship charter is like a true lease and that therefore, with the exception of the assignment of that interest as security, the charter and the lien on subfreights would be excluded from Article 9. Thus, it concludes that the lien is perfected without being filed pursuant to the terms of Article 9. Gerrards' Reply Brief at 5–7. Gerrards staunchly opposes the suggestion that contractual maritime liens are subject to Article 9, both due to the historical priority of the shipowner's lien on subfreights over a Trustee's non-maritime lien, and because of the absence of any indication in the legislative history that the drafters of the Code intended to disturb those traditional priorities.

In response, the Trustee maintains that the cases cited by Gerrards treating the priority on the lien between it and the shipowner are inapposite since they all predated the 1966 amendments to the Code. Trustee's Brief in Support of its Motion at 11. Both sides concede that there appear to be no recent decisions on point. The Trustee also argues that a maritime lien cannot be perfected unless filed as required by Article 9, and that if the legislature had intended to exclude maritime liens on subfreights from Article 9, it would have specifically done so, as was done with a true lease, *see*, N.Y. [Uniform Commercial Code] § 1–201(37) (McKinneys 1964), and an interest in real estate, *id.* § 9–104(j). Finally, he contends that regardless of whether the legislative history spoke only of assignments of ship charters, the intent of the drafters was not to limit the scope of

§§ 9–106 and 9–105(1)(b), nor to alter the plain language of the statute. Trustee's Brief in Support of its Motion at 12. The Trustee asserts additionally, that even if I find that the shipowner's lien on subfreights was without the ambit of Article 9, Gerrards claim would still be precluded by the Assignment of Claims Act. Trustee's Brief in Support of its Motion at 37.

Bankruptcy Judge Ryan adopted the Trustee's view and held that under Section 9–106 "rights under a charter" included maritime liens. Thus construing the statute narrowly, the court held that Gerrards' lien on subfreights was a separate and distinct security interest, and was therefore subject to the filing requirements of Article 9. 15 B.R. at 491.

The court relied in part on *In re Leckie Freeburn,* 405 F.2d 1043 (6th Cir.1969), for the principle that a security interest incorporated in a "true lease" was nonetheless subsumed by the filing requirements of Article 9. That case involved a dispute between the trustee and a lessor as to which had priority on a claim for the machinery of the bankrupt. The lessors claimed a superior right due to a lien on the equipment incorporated in the lease of coal mining rights which it granted to the lessee. The Sixth Circuit held for the trustee on the grounds that the lessors had failed properly to perfect its security interest in accordance with the demands of Article 9. *Id.* at 1046.

The choice of *In re Leckie Freeburn, supra,* as support for the argument that Article 9 applied to Gerrards' maritime lien, is misplaced, since as I read that case, the parties did not dispute that the lessor's security interest in the bankrupt's assets was covered by the Code's filing procedures. Rather, the issue before the court was whether the *manner* in which the lessors filed the lease was "sufficient under the Uniform Commercial Code to perfect a security interest in favor of the lessors on the ... machinery and equipment of the Bankrupt." *Id.* at 1046.

*Determination*

Prior to the 1966 amendments to Sections 9–106 and 9–105(1)(b), the shipowner's lien

on subfreights had priority over the Trustee in bankruptcy without perfection. *See, Diana Co. Maritima, supra,* 280 F.Supp. at 614–15; *In re North Atlantic & Gulf Steamship Co., supra,* 204 F.Supp. at 905; *In re Bauer Steamship Corporation,* 167 F.Supp. 909, 910 (S.D.N.Y.1957) (Dimock, J.).

The leading case is *In re North Atlantic & Gulf Steamship, supra,* in which this court held that where the owner's lien on subfreights arose prior to the time of filing the petition in bankruptcy, the shipowner's security interest in the freights was superior to the trustee's lien. *Id.* at 905. The owner's lien "arose" when the vessel was loaded with cargo. *Id.* at 904. Similarly at issue was Clause 18 of the New York Standard Produce Exchange Form, which as here provided: "... That the Owners shall have a lien upon all cargoes, and all subfreights for amounts due under this Charter." *Id.*

In finding for the shipowner, the court stated:

> Thus the owner's lien on subfreights earned by a vessel, for hire due under its charter, which has been asserted by notice to a shipper from whom the earned subfreights are due, is not void under § 67, sub. a.... It is a maritime lien arising out of maritime contract and is not 'obtained by * * * * legal or equitable process or proceedings.' It is valid and enforceable against the trustee. *Id.* at 905.

In *Diana Co. Maritima, supra,* this court reaffirmed that position:

> Section 67(a) of the Bankruptcy Act neither applies to nor invalidates contractual, common law, equitable and statutory liens... No legal or equitable process or proceeding is required for the creation of a maritime lien on subfreights.... the maritime lien in the present case arose out of the charter party ...—a maritime contract—and is therefore, not 'obtained' by legal or equitable process or proceeding... The maritime lien on all the subfreights presently held by the Court is therefore, valid as against the Trustee

under any and all provisions of the Bankruptcy Act. *Id.* at 614–15.

In line with this reasoning are the conclusions of Grant Gilmore, co-author of *The Law of Admiralty* (1957, 2d ed. 1975), who in an opinion letter submitted on behalf of Gerrards stated that for the purpose of Article 9 a ship charter was like a true lease and as such did not come under the filing provisions of Article 9. Affidavit of Phillip Moyles, Exhibit 2 at 9. He viewed the Article as applicable only to the transfer of the charter or its ancillary rights as security. *Id.*

In light of the seeming unquestioned priority of the shipowner's lien on subfreights as against the Trustee before the 1966 amendments, it would seem logical to assume that had the desire been to effect a major change in maritime law by requiring the filing of the owner's security interest, it would have been clear from the plain language of the statute or at least noted, if only cryptically, in the legislative history. Instead, a careful perusal of the Code and of the Drafter's Official Comments to the 1966 amendments to Sections 9–105(1)(b) and 9–106 find them barren of any such suggestion.

The reasons given for the 1966 amendments to Section 9–105 were that:

> Many types of *ship financing* based on *assignment of a charter* involve international transactions and there are numerous executed copies of the charter... Application of this rule would require the parties to change traditional practices in order to control all executed copies. Moreover, it is desirable to treat all types of ship charters alike, and some cannot be deemed chattel paper. This amendment and the related amendment to 9–106 make it clear that ship charters are 'contract rights' (emphasis added) Report No. 3 of the Permanent Editorial Board for the Uniform Code at 16, Appendix to Gerrard's Brief in Support of its Motion.

Similarly, the comments interpreting the amendments to Section 9–106 address solely the question of the assignment of ship charters, and in particular the potential prob-

lems created where there are ancillary rights to the payment of money provided for in the charter assignment. The Board concluded:

> These ancillary rights if considered in the abstract, might be thought to be 'general intangibles,' since they do not themselves involve the payment of money; but it is not the intent of the Code to split up the rights to the payment of money and its ancillary supports and thereby multiply the problem of *perfection of assignments.* Therefore, all ... rights of the owner in a ship charter are to be perfected as 'contract rights.' (emphasis added) *Id.* at 20.

Reference in 9–106 to the perfection of "unearned rights in a ship charter" is likewise directed to the subsequent assignment of those rights—

> It has been found advisable to distinguish rights earned from rights not yet earned for several reasons. The recognition of the 'contract right' as collateral in a security transaction makes clear that this Article rejects any lingering common law notion that only rights already earned *can be assigned.* Furthermore, in the triangular arrangement following assignment, there is reason to allow the original parties—assignor and account debtor— more flexibility in modifying the underlying contract before performance. It will, however, be found that in most situations the same rules apply to both accounts and contract rights. The application of the same rules to rights under ship charters, whether earned or unearned, is assured by the last sentence of the Section: such rights are contract rights without regard to the general definitions. (emphasis added) *Id.*

Finally, an article written by Homer Kripke, *Suggestions for Clarifying Article 9: Intangibles, Proceeds and Priorities,* 41 N.Y.U.L.Rev., 687, 695 (1966), leaves little doubt that the issue fueling the 1966

amendments was the perfection of ship charter assignments. He observed that in 1966 and 1965 the New York financial bar expressed dissatisfaction with the ambiguous Code classification of ship charters and related contracts. He further stated:

> It was argued that ship charters of various kinds contain some elements of a lease, i.e., chattel paper, and also some elements of a contract right, account and general intangible. It was pointed out that financing through assignment of ship charters is made hazardous by uncertainties of where to file.... This type of difficulty led in New York to amendments of sections 9–105 and 9–106 in 1966, making it clear that ship charters should be deemed to be contract rights and not to be chattel paper. *Id.* at 698– 99.

Thus, every reference to and explanation of the amendments points to the conclusion that their purpose was to provide uniformity in the perfection of assignment of ship charters. This result is further mandated by the Board's express desire not to "change traditional practices" in regard to ship financing, and the undisputed pre-Code rule that a contractual maritime lien on subfreights had priority over a trustee's lien in bankruptcy.

It is not the place of the courts to attribute an intention to the legislature where one is not clearly expressed. *Banzhaf v. FCC,* 405 F.2d 1082, 1089 (D.C.Cir.1968), *cert. denied sub nom., National Broadcasting Co., Inc. v. FCC,* 396 U.S. 842, 90 S.Ct. 51, 24 L.Ed.2d 93 (1969). Accordingly, I find that the shipowner's maritime lien on subfreights will have priority over the trustee's lien in bankruptcy without filing under Article 9.

The Trustee's closing argument that Gerrards has failed to comply with the Assignment of Claims Act, 31 U.S.C. § 203 [10] ("The Act"), and hence is precluded from

---

**10.** 31 U.S.C. § 203 was revised by Pub.L. 97– 258, Sept. 13, 1982, 96 Stat. 976, to read in part:

"(b) An assignment may be made only after a claim is allowed, the amount of the claim is

decided, and a warrant for payment of the claim is issued. The assignment shall specify the warrant, must be made freely and must be attested to by 2 witnesses ..."

recovering those sums paid by AID, has no merit. 31 U.S.C. § 203 provides in pertinent part:

All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein ... shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof....

Gerrards admits that it did not adhere to the provisions of the Act, but it asserts nonetheless that its claim is not barred because: (1) the Act does not apply to claims against the government arising after the date of the assignment; and (2) it does not control the rights of the parties after the government has paid the claim that has been assigned.

The Assignment of Claims Act was enacted to protect the government. *In re Ideal Mercantile Corporation,* 244 F.2d 828, 831 (2d Cir.1957). Accordingly, only the United States may assert it. *United States v. Certain Space, Syracuse, New York,* 320 F.Supp. 491, 496 (N.D.N.Y.1969). Moreover, an assignment which arose before the assignee's claim against the government does not come under the Act. *Poorvu v. United States,* 420 F.2d 993, 1003 (Ct.Cl. 1970); *Rocky River Co. v. United States,* 169 Ct.Cl. 203, 206–07 (1965). The Act also will not come into play where the government has already paid the claim which is the subject of the parties' dispute. *Danning v. Mintz,* 367 F.2d 304, 306 (9th Cir.), *cert. denied,* 386 U.S. 990, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1966).

Each of these exceptions is present in the instant case. The assignment arose before Gerrards served notice of its claim on AID for the subfreights, *see Diana Co. Maritima, supra,* 280 F.Supp. at 611; *In re North Atlantic & Gulf Steamship, supra,* 204 F.Supp. at 904; *In re Bauer Steamship Co., supra,* 167 F.Supp. at 910. The Trustee rather than the government is asserting the Act and furthermore AID has paid the

amount due under the lien to the Bankruptcy Court. Trustee's Statement Under Local Rule 9(g) at ¶ 15. Hence, the prime evil sought to be avoided, that of embroiling the government in a controversy over multiple claims to the fund, cannot occur.

Accordingly, the decision of the Bankruptcy Court is reversed.

IT IS SO ORDERED.